391 So.2d 601 (1980)
Crawford BULLOCK, Jr.
v.
STATE of Mississippi.
No. 51937.
Supreme Court of Mississippi.
August 6, 1980.
Rehearing Denied January 14, 1981.
*604 Bell & Brantley, Don H. Evans, Robert J. Brantley, Jr., Jackson, for appellant.
Bill Allain, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Edward Peters, Dist. Atty., Jackson, for appellee.
En Banc.
LEE, Justice, for the Court:
Crawford Bullock, Jr. was indicted at the November 1978 Term of the Circuit Court, First Judicial District, Hinds County, for the capital murder of Mark Dickson, while committing the crime of robbery against Dickson. A bifurcated trial was held during the May 1979 Term of said court, Honorable William F. Coleman presiding, and the jury returned a guilty verdict of capital murder at the conclusion of the first phase of the trial. A separate sentencing phase was held following the guilty verdict, and, after deliberation, the jury returned a verdict imposing the death sentence as punishment for the crime. Bullock has appealed here and has assigned and argued twenty-eight (28) errors in the trial below.
On the evening of September 21, 1978, Crawford Bullock, Jr. and Rickey Tucker went to Town Creek Saloon, where they drank alcoholic beverages during the night. When Bullock and Tucker decided to leave in the early morning of September 22, they discovered that the person, with whom they had ridden there, had left them. Mark Dickson was leaving the place and he offered to give them a ride home in the gray Thunderbird automobile he was driving.
On the way home, Bullock had Dickson stop at a convenience store in order for him to buy some bread. Dickson gave Bullock thirty-five cents (35¢) for that purpose, but the money was returned when it was found the store had no bread.
Dickson drove on at his riders' instructions. Bullock asked him to stop the automobile in order that he could answer a call of nature. Upon returning to the vehicle, Bullock overheard an argument between Tucker and Dickson and heard Tucker say, "Don't make me pull this gun," and he heard Dickson say that he did not have any money but that they could have the automobile. All three re-entered the vehicle, the argument continued, and Dickson stopped on Byrd Drive near a construction site where blows were exchanged between Tucker and Dickson. Tucker told appellant to grab Dickson, which he did. Dickson broke away and left the vehicle. Tucker got out with a whiskey bottle, using it as a club, and advanced toward Dickson who fled with Tucker in pursuit. Tucker tackled Dickson; appellant caught up with them and grabbed Dickson by the head. Tucker struck Dickson on the head with the whiskey bottle which also hit Bullock's hand, broke and cut it. Tucker beat Dickson with his fists, knocked him to the ground, kicked him in the head as he lay on the ground and then repeatedly struck him with a concrete block on the head which resulted in his death. Appellant went across the street to an automobile agency and tried to start one of the vehicles on the outside of the building to no avail.
Tucker suggested that they burn the body and the car, but appellant told him that he knew of a lake near Byram where the body could be disposed of. Dickson's body was loaded into the car, and they drove to a car wash, where the blood was washed away. Tucker removed Dickson's wallet from the body, went through it, found no money and disposed of it in a garbage can. Appellant drove the vehicle to his home, where they cleaned up, obtained a garden hose and then drove to the lake near Byram. Dickson's outer clothing was removed, concrete blocks were placed in his T-shirt and shorts, the garden hose was wrapped around the body and the weights, and Tucker pulled the body out into the *605 lake and submerged it. Appellant also went into the lake, felt of the body with his feet, making sure that it was submerged and stuck in the mud at the bottom of the lake.
Appellant and Tucker returned to Jackson and to appellant's home, again cleaned up, and appellant took Tucker home, then went to the University Medical Center where he obtained medical attention for his hand. The next day Tucker and he drove in the Dickson automobile to McComb for the purpose of visiting appellant's grandfather. They failed to find him and returned to Jackson. Appellant retained possession of the automobile.
During the early morning hours of September 23, 1978, appellant began to have pain in his hand, and he returned to University Medical Center, driving the Dickson automobile, where he obtained prescriptions for his injury. On his way home from the hospital, he was stopped by officers of the Jackson Police Department, was arrested, and was taken to the police station. On being stopped and asked about the automobile he was driving, appellant responded that he had borrowed the automobile from a friend. While Dickson was driving the vehicle on the night of his death, the registration tag was on the back seat of the car and when Bullock was stopped, it had been placed on the tag mount outside the car.
At the police station, appellant made inculpatory oral and written statements about the commission of the homicide, which substantially set forth the facts related hereinabove.

GUILT PHASE

I.
Did the court err in finding that appellant's oral and written statements were freely and voluntarily given?
Appellant moved to suppress all statements made by him while in custody of the officers, contending that the statements were inadmissible because they were not freely and voluntarily given. He was held in the Jackson City Jail for approximately nine (9) hours after his arrest and at the end of that period, he was questioned by Detective Fondren and Officer Jordan about the homicide. Appellant executed a written waiver of his constitutional rights, and afterwards, gave an oral statement to the officers setting out his involvement in the crime. The statement was reduced to writing and was signed by the appellant. A pre-trial suppression hearing was conducted, the officers present when the statements were made testified that appellant was advised of his constitutional rights prior to making the statement, that he acknowledged understanding them and executed a written waiver thereof. The oral statement made to the officers was typed up by Detective Fondren, was read by the appellant, and was then signed by him.
Appellant denied that the statements were freely and voluntarily made and contends that the officers withheld medical treatment for his injured hand until he gave the statements. The officers testified that appellant did not complain of pain with his hand until they had completed the interrogation. They offered medical assistance to him, but appellant insisted on getting through with the statement first, and that he then go to the doctor. The officers testified that appellant was alert and coherent, and that he was not under the influence of medication or pain. After the officers received the statements, appellant was taken to the hospital. His temperature was 103° , he was treated, and remained in the hospital for one week.
Detective Fondren visited appellant while he was in the hospital and, after again being advised of his constitutional rights, appellant told Detective Fondren that on the night of the homicide Tucker and he were high on drugs and beer and the only explanation he could give for killing Dickson was that Tucker was trying to rob him. Security Officer King was outside the hospital room and he could see Detective Fondren talking to appellant, but he could not hear what was being said. They both testified that his statement was given freely and voluntarily.
*606 After appellant testified, the officers were placed on the stand in rebuttal, and testified that the Miranda rights were given, the statements were freely and voluntarily made, and that the appellant knew what he was doing when he made the statements and executed them. The procedure outlined in Agee v. State, 185 So.2d 671 (Miss. 1966) was strictly followed, and the trial judge held that the statements made by appellant were freely and voluntarily given. The court's finding was supported by the evidence, and we cannot overrule or disturb that finding. Clemons v. State, 316 So.2d 252 (Miss. 1975).
Appellant testified in his own defense at both phases of the trial. His testimony was practically identical with that of his statements, and reiterated and enlarged upon those statements.

II.
Did the trial court err in refusing to sustain defendant's demurrer to the indictment?
Appellant contends that the indictment here was faulty and subject to demurrer for the reasons that it did not set forth the necessary and essential elements of the crime of robbery, and did not refer to the proper statute [Mississippi Code Annotated § 97-3-19(2)(e) (Supp. 1979)], to charge the crime of capital murder.
The same question was raised in Bell v. State, 360 So.2d 1206, 1208-09 (Miss. 1978), wherein the Court held that the indictment, such as here, was sufficient to give the accused fair notice of the crime charged in clear and intelligible language. See also Culberson v. State, 379 So.2d 499 (Miss. 1979); Bell v. State, 353 So.2d 1141 (Miss. 1977). The trial court properly overruled the demurrer.

III.
Did the trial court err in refusing to grant appellant's requested circumstantial evidence instructions?
Appellant contends that the trial court should have granted the circumstantial evidence instructions requested by him. Such instructions should be given only in a purely circumstantial evidence case. DePriest v. State, 377 So.2d 615 (Miss. 1979). The case sub judice does not come under that classification because there was direct evidence consisting of the statements made by appellant and his own testimony adduced in the trial on the guilt phase of the case. See McCray v. State, 320 So.2d 806 (Miss. 1975).
The trial court granted an instruction known as the "two-theory instruction" which should not be given, except in purely circumstantial evidence cases. Thus, even though appellant was not entitled to circumstantial evidence instructions, he received the benefit of the principle by the two-theory instruction granted by the court.

IV.
Did the trial court err in refusing to grant appellant's requested peremptory instruction and in refusing to reduce the charge to manslaughter?
In passing upon a requested peremptory instruction, or motion for directed verdict, in a criminal case, all evidence most favorable to the State, together with reasonable inferences, are considered as true and evidence favorable to the appellant is disregarded. If such evidence will support a guilty verdict, the request for peremptory instruction must be denied, as well as the motion for directed verdict. Warn v. State, 349 So.2d 1055 (Miss. 1977); Toliver v. State, 337 So.2d 1274 (Miss. 1976).
In the case sub judice, appellant argues that there was no evidence of intent to rob Dickson and that appellant was an unwilling participant in the robbery-homicide. The evidence is overwhelming that appellant was present, aiding and assisting in the assault upon, and slaying of, Dickson and in removing and discarding his wallet and personal effects therein, and in the taking of the T-bird automobile, which was in the lawful possession and use of Dickson.
*607 The trial court did not err in refusing to grant the peremptory instruction of not guilty. Likewise, the court committed no error in declining to reduce the charge from capital murder to manslaughter. Even so, the question of manslaughter was submitted to the jury upon a proper instruction.

V.
Did the trial court err in refusing to exclude the testimony of certain State's witnesses on the ground that the witnesses discussed their testimony with other witnesses prior to trial and violated the sequestration rule?
Appellant contends that Officer Jackson changed her testimony between the time of the suppression hearing and the date of trial, that at the pre-trial hearing, she testified appellant was handcuffed after his arrest, and, at the trial, she was not sure whether he had been handcuffed. Appellant claims that the change in Officer Jackson's testimony was the result of talking with other officers subsequent to the preliminary hearing.
An examination of the record does not support the argument of appellant on this matter, and indicates that any difference in Officer Jackson's testimony resulted from the manner in which questions were phrased to her. There is no indication of prejudice resulting to the appellant, and, if there was a violation of the sequestration rule, the court has discretion in admitting the witness's testimony, particularly where, as here, there was no prejudice. Ford v. State, 227 So.2d 454 (Miss. 1969).

VI.
Did the trial court err in refusing to grant appellant's motion for appointment of a criminologist or criminal investigator and a psychiatrist to assist in preparation of the defense?
Appellant says that he was denied a fair trial because the lower court overruled his motions to employ various experts. Appellant filed a motion for psychiatric and psychological examinations at the Jackson Mental Health Center. The motion was granted and an examination was conducted. Appellant then requested that another psychiatrist examine him; the court heard the motion and granted same. The record does not indicate whether the examination was conducted.
Appellant also filed a motion requesting that the court pay for the expenses of his own pathologist, which was substituted for a motion to employ a criminal investigator. The appellant did not outline any specific costs for such an investigator, and did not indicate to the court in any specific terms as to the purpose and value of such an individual to the defense. We are of the opinion that the lower court committed no error in declining to authorize expenses for employing such expert and investigator. Davis v. State, 374 So.2d 1293 (Miss. 1979); Laughter v. State, 235 So.2d 468 (Miss. 1970).

VII.
Did the lower court err in admitting photographs of the deceased during trial?
The State offered in evidence, and the lower court admitted, black and white photographs of the victim after he had been slain. Appellant claims that the pictures were inflammatory and had no probative value. The photographs showed how the body was weighted with concrete blocks and how the garden hose was wound around it to hold the blocks in the body for the purpose of submerging it. The condition of the body, as reflected by the photographs, corroborated the testimony of the pathologist, particularly concerning the wounds upon the body.
The trial judge has wide discretion in admitting photographs into evidence, and we are of the opinion that he did not abuse his discretion in admitting the photographs of the victim. Irving v. State, 361 So.2d 1360 (Miss. 1978); Mallette v. State, 349 So.2d 546 (Miss. 1977).

*608 VIII.
Did the trial court err in admitting the testimony of Dr. Galvez and in referring to a photograph introduced by his testimony?
Appellant argues that the evidence of the pathologist, Dr. Galvez, was cumulative and was not necessary to prove the corpus delicti, since the crime had been established by previous witnesses. Appellant relies upon Jackson v. State, 337 So.2d 1242 (Miss. 1976) for the principle that the State's use of a pathologist's testimony is unnecessary to prove corpus delicti where the deceased was found in an unusual place under unusual circumstances. However, Jackson does not support his argument on this point. The pathologist's testimony was proper and beneficial to establish the exact cause of death, which resulted from a fracture of the victim's skull. It further reflected that absence of water in the lungs indicated death to be due to the head injury rather than drowning. The testimony and evidence were properly admitted.

IX.
Did the trial court err in allowing certain witnesses to testify and in violating the bifurcated trial principle mandated by Jackson v. State?
Appellant contends that the court erred in allowing Larry Keen, W.L. Moss and James Jones to testify about conversations they had with Mark Dickson the night he was killed. Appellant says that such testimony, together with the photographs, should not be introduced during the guilt phase of the trial, and, if at all, only during the sentencing phase. The testimony of such witnesses was to the effect that Dickson stated he was not in the mood for drinking and that he was going home because he did not have any money on him. Appellant's attorney conducted a rigid cross-examination of those witnesses concerning what Dickson had told them. The direct examination and the cross-examination were not prejudicial to appellant, and there is no merit in the assignment. Stringer v. State, 279 So.2d 156 (Miss. 1973); Fielder v. State, 235 Miss. 44, 108 So.2d 590 (1959).

X.  XI.
Did the trial court err in not permitting appellant to cross-examine witnesses as to Mark Dickson's character and did it err in refusing to grant a mistrial?
Did the trial court err in allowing Larry Keen and James Jones to testify to the good character and habits of Mark Dickson and in not declaring a mistrial when Larry Keen mentioned the bad character of appellant and in not allowing defense counsel to cross-examine those witnesses as to the bad character of Mark Dickson?
Assignments of error IX, X and XI involve substantially the same question(s). The witnesses mentioned above testified to statements made by Dickson, which have been covered in Assignment IX and which do not constitute reversible error.
Appellant contends that the State attacked the character of appellant by the following question and answer:
Q. Did Mark Dickson, to your knowledge, know either Rickey Turner or Crawford Bullock?
A. I think he knew Bullock. He knew Bullock because Bullock was raised in our neighborhood and we had seen him before out. I was with Mark at the Zodiac Lounge and Crawford [Bullock] was engaged in a fight there and we saw him there, you know.
BY MR. EVANS:
Your Honor, I am going to object to this and move for a mistrial  ask that that be stricken from the record and move for a mistrial. This is absolutely irrelevant. The testimony is inadmissible, it's prejudicial and it's just not supposed to be in this case.
BY THE COURT:
Members of the jury, disregard the last statement that the witness made. Do all of you tell me that you can disregard the last statement?
(Jurors nodding affirmative).
*609 The trial judge sustained appellant's objection to the question and answer, and instructed the jury to disregard the answer, and asked the jury if they could disregard it. The jury gave the judge an affirmative reply. The answer was not responsive to the State's question, the trial judge directed the jury to disregard the question and answer, and it does not constitute reversible error. Holifield v. State, 275 So.2d 851 (Miss. 1973); Hughes v. State, 179 Miss. 61, 174 So. 557 (1937); Dabbs v. Richardson, 137 Miss. 789, 102 So. 769 (1925).

XII.
Did the trial court err in permitting witnesses to testify as to the ownership of the automobile driven by Mark Dickson on the night of the homicide?
Appellant contends that the court erred in permitting Larry Keen to testify about the ownership of the gray T-bird automobile Dickson was driving the night of the homicide. It is undisputed that Dickson was in possession of the said automobile. An indictment charging robbery or larceny of property is properly laid in the party having possession, either as owner, bailee or agent. Mahfouz v. State, 303 So.2d 461 (Miss. 1974); Minneweather v. State, 55 So.2d 160 (Miss. 1951). The assignment is without merit.

XIII.
Did the trial court err in permitting introduction of the high school photograph of Mark Dickson?
Appellant objected to its introduction on the ground that it was irrelevant and inflammatory. The trial judge did not abuse his discretion in admitting the photograph. Voyles v. State, 362 So.2d 1236 (Miss. 1978); May v. State, 199 So.2d 635 (Miss. 1967).

XIV.
Did the trial court err in granting Instruction # 15, which was the capital murder instruction?
Appellant cites no authority on this assignment, but simply argues that it was erroneously given for the reason that there was no requirement for the jury to find Mark Dickson was in fact killed. The pertinent part of the instruction follows:
"[A]nd, if the Jury further finds from the evidence in this case, beyond a reasonable doubt, that on said date aforesaid, while engaged in the commission of the aforesaid robbery, if any, that the said Crawford Bullock, Jr., did alone, or while acting in consert [sic] with another, while present at said time and place by consenting to the killing of the said, Mark Dickson, and that the said Crawford Bullock, Jr., did any overt act which was immediately connected with or leading to its commission, without authority of law, and not in necessary self defense, by any means, in any manner, whether done with or without any design to effect the death of the said Mark Dickson, ..." (Emphasis added)
It may be noticed that the instruction does require a finding that Mark Dickson was killed, and it correctly sets forth the issues which must be decided by the jury before the accused could be convicted. Williams v. State, 317 So.2d 425 (Miss. 1975).
Assignments of Error XV through XXIV deal with the refusal of the trial court to grant certain instructions requested by the appellant. Was it error to refuse those instructions?

XV.
Instruction D-8 was the single juror instruction. The appellant argues that the instruction was "a fair and accurate representation of the law" and should have been granted. The principle of the instruction was covered in Instruction # 12, and, although in different language, it was not error to refuse the instruction. Reagan v. State, 318 So.2d 879 (Miss. 1975).

XVI.
Instruction D-9 was condemned in McNamee v. State, 313 So.2d 392 (Miss. 1975) as being an improper comment on the weight and worth of the defendant's testimony and was properly refused.

*610 XVII.
Instruction D-10 was correctly refused by the lower court since it should be given only in a purely circumstantial evidence case.

XVIII.
Instruction D-30 would have told the jury that it need not find any mitigating circumstances in order to return a sentence of life imprisonment; that a life sentence may be returned regardless of the evidence. The instruction was in direct conflict with Instruction D-20 which told the jury to weigh the mitigating circumstances against any aggravating circumstances before returning a verdict and was correctly refused under Jackson v. State, supra.

XIX.
Instruction D-31 would have told the jury it was instructed there is nothing that would suggest the decision to afford an individual defendant mercy violates the constitution. That statement was taken from language set forth in the opinion of Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 14 L.Ed.2d 859 (1976). It is simply a statement of the opinion, and was not intended as an abstract proposition of law to be given in jury instructions.

XX.
Instruction D-33 would have instructed the jury it was to presume that, if the accused was sentenced to life imprisonment, he would spend the rest of his life in prison, and the jury was to presume that, if the accused was sentenced to death, he will receive lethal gas until he is dead. The instruction was improper and was calculated to confuse the jury.

XXI.
Instruction D-34 and the sense of same, was contained in Instruction # 14, which was granted by the court, and it was not error to refuse D-34.

XXII.  XXIV.
Instructions D-35, D-36 and D-37 did not put the lower court in error for their refusal. They were either improper instructions, or the proper and correct parts were included in Instruction # 14 granted by the court.

XXV.
Did the court err in failing to sustain appellant's motion for a mistrial made during the State's closing argument and in not sustaining objections to prejudicial and inflammatory arguments of the district attorney?
Appellant contends that, during closing argument, the district attorney referred to his problem with psychosis as being a possible explanation for committing the crime. He objected to the remark and stated that such remark was not supported by the evidence. However, appellant himself introduced in evidence the hospital record of appellant which indicated that on May 15, 1978, he was admitted to the University Medical Center for treatment and the diagnosis indicated that he suffered from psychosis. Such evidence was fair comment in the argument by the district attorney.
Appellant next argues that the district attorney gave a false impression to the jury of the elements of the crime of robbery. Part of the argument follows:
"Now, look, if you see a guy on the street, do you walk up and whop him on the head and drop boulders on him and hit him with a two by four and then you take his billfold and you take his car, but you didn't rob him. Do you believe that?"
The trial judge overruled the objection and stated that it was final argument. There is wide latitude for attorneys to argue cases to juries, and we do not think that such remarks of the district attorney were improper or prejudicial.
Appellant objects to argument of the district attorney, which he says was improper because it indicated that fingerprints *611 could not be taken from all the evidence. There was testimony that it was impossible to remove latent fingerprints from concrete and certain other materials introduced in evidence. This was fair argument, and did not constitute error.
Appellant lastly objects to the district attorney's reference to the statement made by appellant to the investigating officers as being a confession.
The statement was incriminating, connected appellant with the crime, and may properly be referred to as a confession. Also, during the trial of the case, appellant's own counsel referred to the statement as being a confession. There is no merit in the contention.

XXVI.
Did the lower court err in denying appellant's motion for a recess until the following morning before proceeding to the sentencing phase of the trial?
The jury returned a verdict of guilty of capital murder in the first phase of the trial at approximately 8:00 p.m. The jurors had eaten supper at that time. The trial judge indicated his desire to proceed with the sentencing phase of the case, whereupon, appellant moved the court to recess until the following morning for that purpose. The trial judge asked the jury whether any of them were too tired to proceed, they indicated that they were not, and the judge assured the jury that, if they became tired at any time, he would stop the proceeding and retire for the evening. The trial proceeded in the sentencing phase and the jury returned a verdict for the death penalty at approximately 11:00 p.m. The facts of the case sub judice may be distinguished from that of Thornton v. State, 369 So.2d 505 (Miss. 1979) where two of the defendant's attorneys, one approximately seventy (70) years old and one in ill health, were not able to properly function because of their infirmities. The attorneys were also restricted in their final argument to short periods of time.
Here, appellant was not restricted in any manner in the presentation of his defense, the record reflects that he was not prejudiced by proceeding into the sentencing phase and that he had a fair trial. The lower court proceeded under the guidelines of Jackson v. State, and there was no error in so doing.

XXVII.
Was the verdict of the jury contrary to the overwhelming weight of the evidence and did it evince bias, passion and prejudice?
The sense and principle of this assignment of error has been discussed in Assignment IV, wherein the appellant claimed that the court erred in declining his request for a peremptory instruction of not guilty.
As stated there, the evidence for the State, including the oral and written confessions of appellant, his testimony at the trial, and the physical evidence, unless rejected by the jury, was amply sufficient to prove beyond reasonable doubt the guilt of the appellant and the verdict was not contrary to the great weight of the evidence.

XXVIII.
Did the lower court err in overruling appellant's motion to quash the indictment and in declining to declare the statute unconstitutional?
This Court has spoken on the constitutionality of the death penalty statute and has determined that the statute, as implemented by the legislature and construed by the court, is constitutional. In Coleman v. State, 378 So.2d 640 (Miss. 1979), the Court said:
"This contention is without merit. The constitutionality of the death penalty as imposed under Section 99-19-101, et seq. has been firmly established. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Washington v. State, 361 So.2d 61 (Miss. 1978)." 378 So.2d at 647.
In our opinion, there were no reversible errors in the guilt phase of the trial and the case should be, and is, affirmed.

*612 SENTENCING PHASE
Mississippi Code Annotated Section 99-19-105 (Supp. 1979) provides the following:
"(1) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Mississippi Supreme Court. The clerk of the trial court, within ten (10) days after receiving the transcript, shall transmit the entire record and transcript to the Mississippi Supreme Court together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and the punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the Mississippi Supreme Court, a copy of which shall be served upon counsel for the state and counsel for the defendant.
(2) The Mississippi Supreme Court shall consider the punishment as well as any errors enumerated by way of appeal.
(3) With regard to the sentence, the court shall determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 99-19-101; and
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
(4) Both the defendant and the state shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.
(5) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:
(a) Affirm the sentence of death; or
(b) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.
(6) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration. The court shall render its decision on legal errors enumerated, the factual substantiation of the verdict, and the validity of the sentence."
We have held in Jackson, and pursuant to the above section, that cases in which a death sentence is imposed will be automatically reviewed as preference cases by this Court; that the record will be reviewed and compared with similar cases to determine whether the punishment of death is too great when the aggravating and mitigating circumstances are weighed against each other in order to assure that the death penalty will not be wantonly or freakishly imposed; and only will be inflicted in a consistent and even-handed manner under like or similar circumstances.
Since Jackson v. State, 337 So.2d 1242 (Miss. 1976), eleven (11) capital murder cases have been decided by this Court. Seven (7) of those cases have involved felony (robbery) murder. Reddix v. State, 381 So.2d 999 (Miss. 1980); Jones v. State, 381 So.2d 983 (Miss. 1980); Culberson v. State, 379 So.2d 499 (Miss. 1979); Irving v. State, 361 So.2d 1360 (Miss. 1978); Voyles v. State, 362 So.2d 1236 (Miss. 1978); Washington v. State, 361 So.2d 61 (Miss. 1978); Bell v. State, 360 So.2d 1206.
We have carefully reviewed those cases and compared them with the case and sentence sub judice. Appellant contends that the extent of his involvement in the crime was as an accomplice, who did not strike the fatal blow, and that Tucker was the principal, who killed the victim. He argues that Tucker was given life imprisonment by the jury, which tried him; that appellant should not receive a greater or harsher penalty than Tucker; and that appellant's death sentence should be reduced to life imprisonment.
*613 In Coleman v. State, supra, Coleman was found guilty by a jury in the robbery-murder of one Burkett, and was given death. He was sixteen (16) years of age and fired the fatal shot that killed Burkett. His accomplice in the crime was permitted to enter a guilty plea to manslaughter and was sentenced to a term of years in the penitentiary. In comparing Coleman's death sentence to that of other cases heard by this Court, we said:
"Having carefully compared the case at bar with these cases in which the sentence of death was imposed, we are of the opinion that the sentence of death in this case `is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.'
In Irving, Washington and Bell, the killings were totally senseless and committed upon hapless victims unarmed and unable to protect themselves. The circumstances in this case are strikingly different. Here, Harry Burkett, the victim, upon seeing the foot of Sims protruding from under the pickup truck, began firing his pistol. Only after being fired upon did the 16-year-old Coleman shoot. Again, Coleman had the opportunity to shoot Mrs. Burkett, who was an eyewitness, but did not. He fled the scene instead.
Under the specific authorization of subsection (5)(b) of § 99-19-105, this Court affirms the conviction but reverses and sets aside the death sentence and remands this case to the trial court for modification of the sentence to imprisonment for life." 378 So.2d at 650.
In Culberson v. State, supra, Culberson was found guilty of robbery-murder and was given the death penalty. The principal evidence and witness against Culberson was an accomplice, Alvarese Pittman. His testimony was substantially to the effect that he was with Culberson, they were going to rob the victim, that he did not know Culberson had a pistol until Culberson shot and killed the victim. On a plea of guilty, Pittman was given a comparatively light sentence in the penitentiary. The Court said, in affirming the death penalty:
"This leaves the question of whether the words in Subsection (3)(c), `imposed in similar cases, considering both the crime and the defendant,' include for our review and comparison the exact and therefore similar crime of the accomplice and the sentence received by him for it. We construe the language to include not only the capital cases heretofore determined by this Court in which the death sentence has been imposed or rejected on the merits, but also cases involving multiple defendants when one participant is given the death penalty and an accomplice less than death. One of the questions arising in such cases is whether a sentence of less than death to an accomplice was a result of prosecutorial discretion. An affirmative answer raises a second question, was the discretion abused?
* * * * * *
We hold prosecutorial discretion was not abused because Pittman, who did not fire the fatal shot, was permitted to plead guilty to manslaughter, while Culberson, the one who fired the fatal shot, was given the death penalty. We hold the death penalty was not applied capriciously in this case. It is a proper sentence for the senseless and unprovoked murder committed by Culberson, who, after first knocking the victim down with a table leg, then shot the victim while he was lying on the ground begging, `Help me, help me.'" 379 So.2d at 510.
In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), Sandra Lockett was charged with aggravated murder with aggravating specifications. She and three (3) others conspired to rob a pawnbroker's shop. Lockett remained in the getaway automobile with the engine running, the other three entered the pawn shop and during the robbery, Parker, one of the three, killed the proprietor. Prior to trial, Parker pleaded guilty to the murder charge, and agreed to testify against Lockett and the other two. In return, the prosecutor dismissed the aggravated robbery charge and *614 the specifications to the murder charge which limited the possibility that Parker could receive the death penalty.
Two weeks before Lockett's separate trial, the prosecutor offered to permit her to plead guilty to voluntary manslaughter and aggravated robbery, offenses which carried a maximum penalty of twenty-five (25) years imprisonment. Prior to the trial, he offered to permit her to enter a plea of guilty to aggravated murder without specifications, an offense carrying a mandatory life penalty. These plea bargaining offers were rejected by Lockett; she was tried and was given the death penalty.
Although the case was reversed on another ground, the question was raised as to whether or not Lockett's conviction as an aider and abetter of the actual killer was invalid on the ground that the interpretation by the Ohio Supreme Court of the complicity provisions of the Ohio statute, under which the defendant was convicted, was so unexpected that it deprived her of her due process right to fair warning of the crime with which she was charged.
The United States Supreme Court held that her conviction as an aider and abetter of the actual killer was not invalid.
In Coppola v. Commonwealth, 220 Va. ___, 257 S.E.2d 797 (1979), the Virginia Supreme Court held that a co-defendant is not necessarily entitled to commutation of the death sentence because an equally culpable accomplice, on substantially the same evidence, has been sentenced to life imprisonment. That Court held that a determination of the proportionability of punishment requires only that the death sentence not be so incommensurate with his conduct, measured by other jury decisions, involving similar conduct.
In the case at bar, there is no record of the aggravating circumstances and mitigating circumstances in the trial of Tucker, and it is not possible to determine what circumstances influenced the jury in its life verdict. The law is well settled in this state that any person who is present, aiding and abetting another in the commission of a crime, is equally guilty with the principal offender. Jones v. State, 307 So.2d 549 (Miss. 1975); Bass v. State, 231 So.2d 495 (Miss. 1970); McBroom v. State, 217 Miss. 338, 64 So.2d 144 (1953).
When we compare the present case to other capital cases, which have been affirmed by this Court on the death penalty, the present robbery-murder is equally as wanton, cruel, senseless, heinous and atrocious as those. The evidence is overwhelming that appellant was an active participant in the assault and homicide committed upon Mark Dickson and, in our opinion, is not so disproportionate, wanton or freakish when compared to those crimes so as to require this Court to reduce the sentence to life imprisonment.
Therefore, the judgment of the lower court is affirmed and Wednesday, the 10th day of September, 1980, is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED AS TO GUILT PHASE: AFFIRMED AS TO SENTENCING PHASE.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, BOWLING and COFER, JJ., concur.