431 So.2d 1101 (1983)
Marion Albert PRUETT
v.
STATE of Mississippi.
No. 54000.
Supreme Court of Mississippi.
February 23, 1983.
Rehearing Denied March 16, 1983.
*1102 Binder, Kirksey & DeLaughter, William B. Kirksey, Alvin M. Binder, Jackson, for appellant.
Bill Allain, Atty. Gen. by Bill Patterson, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
BOWLING, Justice, for the Court:
Appellant Marion Albert Pruett was indicted in the Circuit Court of the First Judicial District of Hinds County for the crime of capital murder. Venue was moved to Lowndes County and in a bifurcated trial, as required by statute and prior decisions of this Court, he was found guilty of the crime at the conclusion of the guilt phase. After presentation of the penalty phase to the jury, it found that appellant should be put to death as the penalty for his crime. On appeal to this Court, appellant assigns four alleged reversible errors as follows:
I. THE LOWER COURT ERRED IN ASSUMING JURISDICTION AND VENUE OVER APPELLANT ON THE CHARGE OF CAPITAL MURDER; IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT, DIRECTED VERDICT AND PEREMPTORY INSTRUCTION; AND IN GRANTING THE STATE'S INSTRUCTION S-1.
II. THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE AND ADMITTING CONFESSIONS INTO EVIDENCE WHICH WERE ELICITED FROM APPELLANT BY PROMISES OF DRUGS FROM AUTHORITIES.
III. THE LOWER COURT ERRED IN SEATING MR. SIDNEY GRAHAM (JUROR # 8) ON THE JURY AND APPELLANT WAS DENIED THE OPPORTUNITY TO EXERCISE PEREMPTORY CHALLENGES IN AN INTELLIGENT AND KNOWLEDGEABLE MANNER BECAUSE OF SAID JUROR'S MISSTATEMENTS DURING VOIR DIRE.
IV. THE LOWER COURT ERRED IN ADMITTING AN EDITED TELEVISION INTERVIEW INTO EVIDENCE AT THE SENTENCING PHASE OF THE TRIAL.
Appellant was indicted under Mississippi Code Annotated, Section 97-3-19(2)(e) (Supp. 1982), which provides as follows:
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
* * * * * *
(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson or robbery, or in any attempt to commit such felonies;
The punishment phase of the bifurcated trial was conducted pursuant to the provisions of MCA § 99-19-101 (Supp. 1982). It *1103 should first be noted that no error is assigned because of any alleged failure to follow the provisions of the statute.
The facts of the crime are practically admitted in their entirety, except for one instance; that is, the events immediately prior to appellant shooting the deceased, Peggy Lowe. All underlying occurrences were testified to by appellant as his only witness during the guilt phase of the trial. There is no contention or indication that Pruett was mentally incompetent. In fact, the entire record and history of this particular case, as well as Pruett's prior activities, clearly reveal that he is a very intelligent and crafty person. The circumstances leading to the death of Peggy Lowe were clearly revealed by appellant's sworn testimony at the trial. Early on the morning of September 17, 1981, appellant appeared at the branch office of Unifirst Savings & Loan Association located in the Metrocenter shopping area where Peggy Lowe worked with three other female employees. According to appellant, he picked out this business because no male employees were present, stating that men would be more likely to give him trouble than women. Appellant had stayed the prior night at a motel not very far from the area. The purpose of appellant entering the savings and loan association branch office admittedly was to commit an armed robbery and to take a hostage for the purpose of making his escape. During the progress of the armed robbery, Mrs. Lowe received a call from her son and made an engagement to meet him for lunch. Appellant decided that it would suit his purposes better to take Mrs. Lowe as hostage rather than the other person originally selected.
The armed appellant then took the money and Peggy Lowe to her car and drove to another part of the shopping center. He then placed her in his car, drove around several streets in the area, and then drove to Interstate # 20 and approximately 100 miles, without stopping, to Sumter County, Alabama. This county is adjacent to the Mississippi-Alabama state lines. During this entire ride appellant forced Mrs. Lowe to stay on her knees on the floorboard of the passenger front of the car, with her shoulders, arms and head downward on the seat. Whenever passing another vehicle or being passed, appellant would place his coat over Mrs. Lowe so she would not be seen. At one point during the ride, at the request of Mrs. Lowe, appellant permitted her to say a prayer.
After driving into Alabama, appellant left the interstate highway, traveled on a gravel road for a distance and then turned onto a small country road where he stopped. Mrs. Lowe was taken from the car and carried into the woods. According to appellant, he then forced her to disrobe, except for her underclothes. The purpose of this was to keep her under his control so that she would not leave the area. Appellant testified he then went to his car, took a shot of cocaine and went back to check on his prisoner. He found that she had moved from the area. He then, by his own sworn testimony, instructed her to get on her knees, put her face down and repeat her husband's telephone number so that he could be called. Mrs. Lowe was in the process of doing this when appellant, according to his sworn testimony, shot her in the back of the head at close range. Appellant then drove away in his car and visited other parts of the country prior to being apprehended.

POINT I. THE LOWER COURT ERRED IN ASSUMING JURISDICTION AND VENUE OVER APPELLANT ON THE CHARGE OF CAPITAL MURDER; IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT, DIRECTED VERDICT AND PEREMPTORY INSTRUCTION, AND IN GRANTING THE STATE'S INSTRUCTION S-1.
The underlying contentions of appellant under the issues raised regarding this point are that appellant could not be indicted, tried and convicted for the crime of capital murder because the killing of Mrs. Lowe occurred in the State of Alabama.
*1104 Appellant filed a motion attacking the jurisdiction of the Hinds County, Mississippi, court and a hearing was had under stipulation by the state and appellant. This stipulation was as follows:
That Opal H. Lowe, a/k/a Peggy Lowe, died on or about September 17, 1981. That Opal H. Lowe, a/k/a Peggy Lowe, died in Sumter County, Alabama. That said death was caused by a gunshot wound to the back of the head as more fully shown by the autopsy report; that the instrumentality causing the gunshot wound to Opal H. Lowe, a/k/a Peggy Lowe was inflicted in Sumter County, Alabama, on or about September 17, 1981. That said gunshot was fired in the State of Alabama, and the fatal injury as aforesaid, was sustained in the State of Alabama; that Opal H. (Peggy) Lowe had been taken by force, held hostage, and kidnapped in Jackson, Hinds County, Mississippi, on the 17th day of September, 1981, and transported against her will across the Mississippi-Alabama state line into Sumter County, Alabama, where the said Opal H. Lowe, a/k/a Peggy Lowe, sustained the aforesaid gunshot wound. That the body of Opal H. (Peggy) Lowe was found in Sumter County, Alabama, on the 27th day of October, 1981.
Appellant contends that the killing of Mrs. Lowe was "murder" that occurred in the State of Alabama for which only Alabama had jurisdiction. He contends that the indictment and trial of appellant for "capital murder" did not change the act of killing from one single crime consummated in Alabama. Appellant cites several cases regarding venue and jurisdiction from courts of several states. We have examined those cases and find they have no application here. Unquestionably, the State of Alabama could have indicted and tried appellant for murder in that state. It did not do so. The first indictment returned against appellant was in Hinds County, Mississippi, from which county Mrs. Lowe admittedly was kidnapped.
As hereinbefore stated, appellant was indicted under the provisions of MCA § 97-3-19. Under that section the crime of "murder" is defined as the killing of a human being without authority of law by any means or in any manner in the following cases:
(a) When done with deliberate design to effect the death of the person killed, or of any human being.
(b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual.
(c) When done without any design to effect death by any person engaged in the commission of any felony other than rape, kidnapping, burglary, arson or robbery, or in any attempt to commit such felonies.
The specific indictment returned against appellant was that of "capital murder" under the provisions of MCA § 97-3-19(2)(e) which as hereinbefore set out required conviction for the killing of a human being without the authority of law by any means or in any manner, when done with or without any design to effect death by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson or robbery or any attempt to commit such felonies.
The instrument under which appellant was indicted reads as follows:
That Marion Albert Pruett in said District, County and State on the 17th day of September A.D., 1981, was then and there engaged in the commission of the crime of kidnapping of Opal H. Lowe, a/k/a Peggy Lowe, by he (sic) the said Marion Albert Pruett then and there feloniously without lawful authority, forcibly seizing and confining the said Opal H. Lowe, a/k/a Peggy Lowe, with his intent to cause said Opal H. Lowe, a/k/a Peggy Lowe to be confined against her will, contrary to Section 97-3-53, Mississippi Code of 1972, annotated and amended, and while so engaged in said kidnapping, he, the said Marion Albert Pruett, did then and there, without authority of law, *1105 feloniously kill and murder Opal H. Lowe, a/k/a Peggy Lowe, a human being, contrary to and in violation of Section 97-3-19(2)(e), Mississippi Code of 1972, annotated and amended.
Indisputably, the first element of the crime of "capital murder" under the indictment was the kidnapping of Mrs. Lowe. This underlying and necessary to be proved felony continued unbroken until the wooded area in Alabama was reached. We then find the only possible controversy in the record regarding the acts constituting the crime. Appellant testified after making Mrs. Lowe disrobe, he was away from her about fifteen minutes before deciding to kill her. Appellant makes the argument that this period of time broke the chain of events constituting the "capital murder." In addition to this, more than one witness, who visited the scene of the killing with appellant after his apprehension, testified that appellant told them he got no more than around 10 to 15 feet from Mrs. Lowe the entire time. We therefore have two separate admissions. At least it was for the jury to determine whether appellant abandoned the kidnapping and then resumed the act as a mere "murder." In our opinion under appellant's own testimony, he kept complete control of Mrs. Lowe. That was the reason he forced her to disrobe. This control existed until appellant shot Mrs. Lowe in the back of her head. As said above, assuming this to be a finding of fact, the testimony of the witnesses contradicted appellant's testimony that he went to his car for about fifteen minutes before returning and killing Mrs. Lowe. He told them he only went approximately 10-15 feet from her which easily could have resulted in a resolving of the extent of the kidnapping control by the jury.
The killing of Mrs. Lowe in Alabama could not have been capital murder unless she first had been kidnapped. The acts are inseparable under that crime. Appellant contends that the actual pulling of the trigger was the primary element of the capital murder. If this is true, then there would be no kidnapping by appellant and he would have only had a dead body to steal. He stole the live body activating the elements of the crime of capital murder.
Long before the capital murder statute was enacted by the legislature, our statutes included MCA § 99-11-17, which provides as follows:
Offenses commenced in and consummated out of state.
Where an offense is commenced in this state and consummated out of it, either directly or by the accused or by any means or agency procured by or proceeding from him, he may be indicted and tried in the county in which such offense was commenced or from which such means or agency proceeded.
It is inescapable that the essential and, indeed, underlying element of the crime of capital murder started in Hinds County, Mississippi, when appellant, with a gun drawn and the money sack in his hand, forcefully took Peggy Lowe from her place of employment and admittedly committed the acts hereinbefore set out regarding the kidnapping and killing.
Appellant attempts to raise an issue regarding his request for, and the court granting, an instruction on the lesser included offense of murder. He contends that if the jury had returned such a verdict, it would have been void and for this reason the jurisdictional question should be decided in his favor. Our first reaction to this contention is that appellant may be correct in principle, but his argument is not reasonable. In Bell v. Watkins, 692 F.2d 999 (5th Cir.1982), the lower court refused to grant the accused an instruction on the lesser included offense of murder. The Fifth Circuit Court held that the instruction should be granted in a capital murder case, "if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." The appeals court then went on to say, however, "There is no due process violation, however, unless there is some evidence to support an instruction on the lesser included offense." Furthermore, the appellate court said, "In Mississippi no murder committed *1106 during the course of a robbery can be simple murder. Since Bell testified to the robbery any murder committed had to be capital." We have the same situation here. Although appellant contends that in his view, he was away from the deceased, after stripping her of clothing to keep her in hand, for fifteen minutes before actually killing her, it is our opinion that as a matter of law the underlying felony of kidnapping never ceased under the testimony. We are forced to the conclusion, therefore, that as the kidnapping was admitted by appellant, the killing could not have been simple murder under the Mississippi statute. We do not have the element as in Bell, i.e., a lack of definition of armed robbery. We have the actual sworn testimony of appellant regarding the undisputed kidnapping. We are forced to the conclusion therefore, that even had the lower court in the case sub judice refused the lesser included offense instruction, any error would have been harmless under the Bell decision.
We have to go further and recognize as stated above that the lesser included offense instruction was actually given. A clear answer to this is as stated in Bell. "[N]o rational jury could have acquitted him of kidnapping or robbery on the evidence presented." In the case sub judice, no rational jury could have acquitted Pruett of kidnapping, even until the time the bullet entered the back of the head of the deceased.
We, therefore, have a situation where appellant voluntarily requested and was given an instruction to which he was not entitled. If wrong in this, however, such does not change a decision of the case. Even if by some strange jury finding, it had returned a verdict of "not guilty" of capital murder but guilty of simple murder, the verdict merely would have been void. Appellant would, therefore, have benefitted from something to which he was not entitled. He was given more than that to which he was entitled and therefore cannot complain.

POINT II. THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE AND ADMITTING CONFESSIONS INTO EVIDENCE WHICH WERE ELICITED FROM APPELLANT BY PROMISES OF DRUGS FROM AUTHORITIES.
Prior to trial appellant filed a motion to suppress evidence and quash the indictment. This motion recited that appellant was apprehended by law enforcement officers in Stratford, Texas, on October 17, 1981. He was thereafter taken into custody by two officers of the Federal Bureau of Investigation, Agents T. Scott Hendricks and Thomas G. Wagner. The motion does not address any question as to the guilt or innocence of appellant, it already having been assumed by everyone that he was guilty of killing Mrs. Lowe. The motion only addressed whether or not appellant voluntarily agreed to lead officers to her body. Appellant contended in the motion that the two agents offered him cocaine to tell them where the body was located.
Other than the allegations regarding the two FBI agents in Texas, appellant complained that the promises were tendered by O.T. McAlpin of the Jackson Police Department, Detective Monroe and another Jackson police officer, whose name he did not know at that time. The motion stated that these three Jackson police department officers made essentially the same promises as the two FBI agents in Texas. Appellant further contends in the motion that Jackson Police Chief Jim Black and Detective Willie H. Covington ratified the drug promises.
At the pre-trial hearing on the motion to suppress, all of the above named officers testified positively on behalf of the state that the allegations of the motion were untrue and all testified in much detail, both on direct and cross examination, as to what actually happened in their relations with Pruett from the time he was arrested until he finally decided to take them to Mrs. Lowe's body in Sumter County, Alabama. The appellant testified regarding promises of cocaine. He now contends that the state should have reintroduced all the persons he *1107 named in his motion to reaffirm their testimony given on direct examination denying ever making any promises of any kind, drug production or otherwise, to appellant. In propounding this contention appellant relies on Agee v. State, 185 So.2d 671 (Miss. 1966), and Holt v. State, 348 So.2d 434 (Miss. 1977).
It suffices to say that every required element in Agee and Holt, supra, was met. Appellant had filed his petition setting out only the contention that he had been promised drugs to reveal the location of Mrs. Lowe's body. As hereinbefore stated all persons connected with this contention and named by appellant testified, consuming many pages of testimony denying this contention in detail and explaining everything that occurred. The law does not require foolish actions. This would have been the case had the state been required to resubmit all these officers to repeat everything already testified to under oath including extensive cross examinations.
The personal sworn testimony of appellant as the only defense witness in the guilt phase of the trial, is inconsistent with his contention in the motion to suppress. He testified that the reason he finally decided to lead officers to Mrs. Lowe's body was so that her family could give her a Christian burial. His testimony was positive that this decision to do this was not based on any promises whatever from anyone.
Under this point appellant contends that the testimony of U.S. Marshals Leonard and Crumpton should have been excluded at the trial. These marshals from the Jackson, Mississippi, office accompanied the entourage that appellant escorted to Mrs. Lowe's body. It is first noted, as before stated, that the motion to suppress only encompassed the alleged offenses from the time of the appellant's arrest in Texas until his incarceration in the Jackson, Mississippi, jail. He made no complaint of confessions under duress during his trip from Jackson to the scene of the killing. It is readily apparent that the testimony of United States Marshals Leonard and Crumpton were not required on the hearing on the motion to suppress as they had nothing to do with the allegations of the motion.
As a precaution, however, when appellant's attorneys objected to the two marshals testifying about what occurred on the trip to Alabama, the trial court wisely excluded the jury and heard the testimony out of the jury's presence. They were extensively cross examined and any possible error was thereby cured. We reiterate the admission of their testimony at the prior hearing was not required.
On the issue of whether or not appellant, as he testified, voluntarily decided to lead officers to Mrs. Lowe's body, we have the unusual set of circumstances that he did this by leading them through country back roads in the nighttime hours and straight to Mrs. Lowe's body, even though he had been at that location and over those roads one time; that is, the day the kidnapping and killing of Mrs. Lowe occurred. We say this to emphasize the intelligence of appellant and the fact he knew what he was voluntarily doing and was not under the influence of drugs. This, of course, was never suggested.

POINT III: THE LOWER COURT ERRED IN SEATING MR. SIDNEY GRAHAM (JUROR # 8) ON THE JURY AND APPELLANT WAS DENIED THE OPPORTUNITY TO EXERCISE PEREMPTORY CHALLENGES IN AN INTELLIGENT AND KNOWLEDGEABLE MANNER BECAUSE OF JUROR'S MISSTATEMENTS DURING VOIR DIRE.
During the course of the trial judge's voir dire questioning of the jury panel members individually, one juror, Sidney Graham, stated that he could vote guilty of the crime of capital murder but under no circumstances could he vote for the death penalty. After completion of the voir dire examination, which was done thoroughly by the trial judge, the prosecuting attorney and competent defense attorneys, the jury was selected and placed in the jury box with two alternates. Admittedly, the prosecuting attorney realized that he had *1108 made a mistake and confused the number of juror Graham with another. He had selected Graham, although he was definitely opposed to the death penalty. The prosecutor requested the trial court to allow him to amend his jury striking and either voir dire other jurors or permit an alternate to take the place of Mr. Graham. The court refused permission to do this, saying it came too late, the state already had accepted the fourteen jurors.
During the above set out request by the prosecuting attorney, the attorneys for appellant vigorously objected to the court granting the prosecutor's request and vigorously objected to juror Graham being excused. The trial judge agreed with them. Of course, it does not take much trial experience to know the defense accepted Mr. Graham.
Appellant now contends that the court was in error in not dismissing Mr. Graham. It should suffice to say that this was vigorously tried to be accomplished by the state over equally vigorous opposition by appellant's attorneys, who now are trying to put the court in error for seating the juror. The state went so far as to try and secure the sentencing hearing of the bifurcated trial by another jury. This request of the state was refused by the trial court.
There is no question involved in this assignment regarding the propriety of the extensive voir dire examination of the jury panel. The next question, therefore, is why was there a unanimous jury verdict sentencing appellant to death? We do not need to do much surmising in arriving at a conclusion regarding this question. In the first place, it is obvious and also impressive that eleven jurors other than Mr. Graham were unanimous in their verdict after hearing the testimony shown in the record. There is absolutely no accusation of fraud on the part of juror Graham.
As heretofore seen, appellant was indicted in the First Judicial District of Hinds County, Mississippi, the most heavily populated county, located in the central-western section of the state and the state capital. Prior to trial, appellant's attorneys filed a motion to change venue of the trial because of extensive publicity, mainly through television and press media. The trial court agreed with this motion and changed the venue of the cause to a county in the northeast part of the state, which county is indisputably out of the range of all Hinds County television stations. We have to surmise as to what information, if any, juror Graham had about the case prior to the trial. It is entirely possible that he had never read or heard of the heinousness of appellant's actions and entirely possible that he had not had any experience with similar heinous crimes. We, therefore, are led to the reasonable probability that his opinion regarding the death penalty was derived from experiences foreign to the case with which we are now involved.
If any person would ever change his mind regarding a prior opinion against the death penalty in any case, this was a typical case for that change to have been made. Juror Graham sat close by appellant when he gave his testimony regarding the details of the robbery, kidnapping and the actions toward Mrs. Lowe up to the time he put a bullet in the back of her head. He heard appellant tell of other murders and robberies. He sat closely to appellant during the entire trial observing and seeing a man who would do what appellant admittedly did in this case and would commit other murders as appellant readily admitted during his testimony. How can it now be said then that Juror Graham violated his oath and that because of such violation, appellant is entitled to a new trial. There is no indication that anything occurred except that the juror changed his mind. There is nothing to indicate duress, undue influence by other jurors, or any other wrong. We find no reversible error here.

POINT IV: THE LOWER COURT ERRED IN ADMITTING AN EDITED TELEVISION INTERVIEW INTO EVIDENCE AT THE SENTENCING PHASE OF THE TRIAL.
Appellant alleges reversible error by the trial court in permitting portions of a *1109 taped television interview with appellant in the Jackson, Mississippi, jail the day after he led officers to Mrs. Lowe's body. The trial court admittedly edited this tape and permitted parts of it to be shown together with sound during the sentencing phase of the bifurcated trial. Appellant's main contention is that as the tape was used along with other evidence to secure a change of venue, it was thereby improper for it to be presented to the jury in the county to which the case was changed.
The obvious answer to the above contention is that the taped interview was used in the hearing on the motion to change venue solely to show that television viewers in the Hinds County, Mississippi, area would have seen and heard the interview. As above stated, the television range of Hinds County television stations did not reach Lowndes County, where the case was tried, a far distance from Hinds County. There was no evidence whatever that the taped interview was seen by anyone in the Lowndes County area.
A transcription of the questions and answers during the taped interview appears in the record and an examination thereof does not begin to compare with appellant's sworn testimony at the trial and could not possibly have done him as much harm as his personal testimony before the jury reciting the gory details of his killing of Mrs. Lowe.
Appellant also contends that introduction of the partial video tape in the sentencing phase was error as it was in essence a confession by appellant. As stated, above, this so-called confession was minimal compared to the prior testimony heard by the jury from appellant's own mouth on the witness stand as to the details of the commission of the crime. We find no merit to this alleged assignment of error.

CONCLUSION
This Court has carefully considered the entire record in the cause together with all briefs, instruments appearing as evidence, exhibits, and everything required of an appellate court. The jury was fully, properly and fairly instructed in both phases of the bifurcated trial. No alleged error is raised in that regard other than on the motion to suppress, and we can find none after a complete review. We have compared this record with prior cases involving the affirmances of the death penalty by this Court. We have placed in our minds the facts of all such death cases since this Court's opinion in Jackson v. State, 337 So.2d 1242 (Miss. 1976). A study of these cases include, but are not limited to the following: Washington v. State, 361 So.2d 61 (Miss. 1978); Irving v. State, 361 So.2d 1360 (Miss. 1978); Jordan v. State, 365 So.2d 1198 (Miss. 1978); Gray v. State, 375 So.2d 994 (Miss. 1979); Culberson v. State, 379 So.2d 499 (Miss. 1979); Reddix v. State, 381 So.2d 999, (Miss. 1980); Bullock v. State, 391 So.2d 601 (Miss. 1980); Edwards v. State, 413 So.2d 1007 (Miss. 1982); Johnson v. State, 416 So.2d 383 (Miss. 1982); Smith v. State, 419 So.2d 563 (Miss. 1982); Wheat v. State, 420 So.2d 229 (Miss. 1982); King v. State, 421 So.2d 1009 (Miss. 1982); and Evans v. State, 422 So.2d 737 (Miss. 1982).
We find after careful examination that the evidence fully supports the jury's finding of statutory aggravating circumstances as enumerated in MCA § 99-19-101. We find that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in the similar cases considering both the crime and the defendant.
We cannot say with any degree of emphasis that the sentence of death was imposed under the influence of bias, prejudice or any other arbitrary factor.
We have reviewed and fully considered the sworn testimony of appellant confessing to and relating in detail his actions in kidnapping Mrs. Lowe and forcibly carrying her to the wooded area hereinabove described and placing a bullet in her head. The principal reason given by him in confessing all crimes regarding Mrs. Lowe and other murders and armed robberies was that he had become a Christian. A careful reading of appellant's testimony both direct and on cross examination is not convincing that the jury verdict of death should be set aside for that reason, if true. Also, the record reveals the rebuttal testimony of Lowndes County Deputy Sheriff Luther James Williams *1110 during the sentencing phase and after appellant's testimony to the effect that during the nighttime while he was dispensing medication to the inmates of the Lowndes County Detention Center, he overheard appellant telling a trusty that "he [Pruett] had eleven more places to go to and out of those eleven places someone was gonna make a mistake and that he was  that  that he was gonna make his move then and if anyone got in his way, it was more than likely gonna be their skin instead of his because he was trying to save his own hide." The jury certainly had the privilege to weigh the above statement of appellant against his prior confession allegedly because of religious convictions.
Regarding the attorneys appointed by the trial court to represent appellant, we feel it our duty to find the following as facts. The attorneys appointed by the court were those of much experience particularly in defending persons accused of crimes both in this state and other states. They are experienced trial attorneys. Their reputation is that of high competence both in preparation and trial. A thorough study of the record reveals that they performed a thoroughly adequate defense of appellant in the trial court. The briefs and arguments before this Court were highly competent. From our knowledge of trial attorneys and particularly the defense of cases such as the one sub judice, it would be hard to secure more competent and experienced attorneys and ones who would have conducted a better defense than was given appellant. They were not "effective" in securing an acquittal, but that was not because they failed to provide appellant competent, proper and fully adequate legal services.
The cause is affirmed and the 13th day of April, 1983, is hereby set for the execution of the death sentence of appellant as provided by law.
AFFIRMED.
WALKER, P.J., and ROY NOBLE LEE, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
PATTERSON, C.J., and BROOM, P.J., concur in part, and dissent in part.
BROOM, Presiding Judge, concurring in part and dissenting in part:
As to the jury's finding Pruett guilty as charged, I concur fully with the majority in its affirmance. I would add that a more horrifying and brutish killing cannot be imagined. The act justifies the sentence if properly fixed according to law, but here serious difficulties are manifested by the record insofar as the jury's fixing the death penalty is concerned. For the following reasons, another jury, properly qualified and constituted should set the penalty.
TRUTH has long been the capstone of all judicial proceedings in western civilization. This is so regardless of whether the issue may be a $10.00 loan owed a lender, or the guilt of one who appears to have perpetrated the most heinous and calloused killing. In the early stage of Pruett's trial while jurors were being qualified, juror Graham was voir dired and the following is excerpted from his testimony:
BY MR. GRAHAM: I  I could  could not vote for the death penalty even though he was guilty.
BY THE COURT: What about a vote of guilty as explained to you?
BY MR. GRAHAM: Right, I could vote guilty. For life in prison without pardon.
A little later, the district attorney, Mr. Peters, propounded questions to juror Graham as shown by the following excerpt from the record:
BY MR. PETERS: You said on your form when they asked "What do you think of the death penalty?", you put "yes". When the Judge asked you, you said you could not vote for the death penalty even though guilty. I don't mean  I'm asking 
BY MR. GRAHAM: On the  on 
BY MR. PETERS: Did you make a mistake on the form?
BY MR. GRAHAM: On the first part, I could convict him, but on the last part, I could give him life  sentence him without  to life imprisonment without pardon, *1111 but according to my conscience, I couldn't give him the death penalty.
BY MR. PETERS: You could not vote for the death penalty in any circumstances?
BY MR. GRAHAM: Right.
BY MR. PETERS: And you would not be able to follow the law and put aside your personal convictions and vote for the death penalty in a proper case.
BY MR. GRAHAM: No, sir.
After the state failed to peremptorily excuse juror Graham, he was accepted by the defense. Later the district attorney, the Honorable Ed Peters, stated, "We have made an error beyond all errors", and he unsuccessfully sought to have juror Graham replaced by an alternate. Graham was left by the trial judge on the jury and concurred with the other jurors in fixing the death penalty. In so doing, Graham's action was in direct contradiction to what he stated under oath when questioned in open court by the circuit judge and district attorney who later confessed "error beyond all errors".
Majority of the Court takes the position that juror Graham had the right to change his mind after hearing the testimony. If that be in keeping with justice based upon untarnished truth, then why inquire of jurors about their present philosophy concerning death penalty, as we have done through the years before prospective jurors are allowed to become one of the "sacred twelve"? Jurors must be accepted or challenged on what their philosophy is prior to hearing any proof even though testimony may persuade a juror to abandon his or her philosophy. My view is that the trial judge, the prosecutors, and defense lawyers should be able to rely upon what a prospective juror states under oath as to his feelings or philosophy about an issue which is presently to be tried, whether death penalty or some other matter such as whether a juror believes in the law of self defense, etc. Stated differently, the judicial process should not be so concerned with a juror's right to change his mind as with the confidence of a litigant (including counsel) to accept as true what a prospective juror states concerning his convictions regarding justice and rectitude. This Court should not accept less than fidelity to his oath on the part of a juror. Suppose in another case self-defense is an issue, under the majority opinion a juror might begin his service in a trial saying he believed in the right of self-defense and then change his mind.
No case is cited by the majority opinion or by the state in its brief which removes the "taint" resulting in the present trial by the inadvertent error of the prosecution. In order that the "taint" be expiated, the punishment of the defendant should be determined by another panel of jurors who will themselves, with fidelity to their solemn oaths, discharge their duty as fair and impartial jurors.
PATTERSON, C.J., joins in this opinion.