# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-DR-00296-SCT

*ANTHONY DOSS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/1993 |
| TRIAL JUDGE: | HON. JAMES C. SUMNER |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CIRCUIT COURT |
| | ROBERT B. McDUFF |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| ATTORNEY FOR APPELLEE: | BY: MARVIN L. WHITE, JR. |
| | DOUG EVANS |
| | CIVIL - DEATH PENALTY - POST |
| DISTRICT ATTORNEY: | CONVICTION |
| NATURE OF THE CASE: | LEAVE TO SEEK POST-CONVICTION |
| | RELIEF GRANTED IN PART AND DENIED |
| DISPOSITION: | IN PART- 07/15/2004 |

MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Anthony Joe Doss was convicted of capital murder and sentenced to death for the murder of

Robert C. Bell. Doss's conviction and sentence were affirmed by this Court on direct appeal. *See Doss*

*v. State*, 709 So.2d 369 (Miss. 1996), *cert. denied*, 523 U.S. 1111, 118 S. Ct. 1684, 140 L. Ed. 2d

821 (1998). The following summary of the facts is compiled from that opinion:

On May 6, 1991, outside Sparks Stop-N-Shop, a small grocery store in rural Grenada County, Doss, James, Coffey, and Freddie Bell (who was Doss's co-defendant) were sitting at a picnic table when the events giving rise to the subsequent murder began to unfold. As they sat drinking beer and eating potato chips, Freddie mentioned that he needed some money to get to Memphis. According to the other three, Freddie asked them to join him in robbing Sparks. James and Coffey testified that they said no to joining Freddie's plan. They further testified that Freddie then pulled out two guns and gave one to Doss, who testified that it was a .25 caliber gun. According to James, Freddie told Doss they should "go in shooting". Coffey testified that Doss then stated "Let's go. Let's go do it." James and Coffey then left to go to Coffey's home nearby. A few seconds later they heard gun shots coming from Sparks.

Doss admitted that he was given the gun, but said he did not agree to hurt anyone, but he was forced at gunpoint by Freddie to be involved. Doss did admit he went into the store to rob it. Three guns were tested by a Mississippi Crime Lab forensic scientist, who testified that five of the nine bullet holes in the victim were matched to the .38 caliber pistol recovered and tested. Three of the remaining shots were similar but not a 100% match.

Exactly what happened during the commission of the robbery naturally could only be explained by the robbers and Bell. Unfortunately, Bell was dead, Freddie did not testify, and Doss's stories change over the course of time. Once the shooting ceased, however, Freddie and Doss ran from the store and headed up the same road that James and Coffey were on, where Doss and Freddie met them. James testified that Doss was given the .25 caliber gun before entering Sparks and that after the robbery Freddie had the original .22, as well as the .38 which was taken from Sparks. The .22 and .38 caliber pistols were later recovered from Freddie's house and the .25 caliber was recovered from the car of a friend who took them to Memphis.

According to Coffey, Doss then said that he shot Bell in the neck and that it caused him to "hung lower" because he had "emptied his gun into" Bell. Coffey testified that Freddie also admitted to shooting Bell, but did not offer any further comments. James also testified that Doss admitted to shooting Bell. As would be expected, Doss's police station statement and in-court testimony are very different from what others said.

After Doss and Freddie admitted to shooting Bell, Freddie said that he needed to get to Memphis. However, before they left, Freddie allegedly threatened to kill James, stating that he did not want any witnesses. James testified that Doss then stepped in and prevented Freddie from killing James. James and Coffey confirmed that Doss and Freddie had stolen a pistol, a box of shells, and a gray money bag from Sparks. James also confirmed, as did Doss himself, that Doss admitted to unsuccessfully trying to open the cash register.

Subsequently, Freddie, Doss and Coffey went to Memphis leaving James in Grenada County. Coffey testified that he remembered Freddie wanting to go back to Grenada County to shoot James so that there were no witnesses and that Doss said that he "was ready to do it" too. Doss denied suggesting to Freddie that they should go back

and shoot James. Freddie, Doss and Coffey were arrested in Memphis shortly thereafter. Each of the three gave statements in the Memphis police department on May 9, 1991.

Doss, after signing a Miranda form, stated that Coffey was the person who shot Bell with the .38, but he subsequently admitted on cross-examination that his statement about Coffey being involved was a complete fabrication. Doss contends that the statement he gave at trial was the "truth" and that the Memphis statement, which he admitted was riddled with lies, was given because he was "scared" and "knew they wouldn't believe me." The State's physical evidence included, among other things, the store owner's testimony that a .38 caliber gun was taken from the store during the robbery which was matched to guns recovered following the arrests of the suspects. Additionally, the State had ballistics matches between the bullets retrieved from Bell's body and the .38 caliber gun. The State also introduced evidence from the Mississippi Crime Laboratory matching the fingerprints from the coke box behind the counter with those of Doss.

*Doss*, 709 So.2d at 375-77.

¶2. Doss has now filed an application for leave to file motion to vacate judgment and sentence with this Court, raising eight issues: (1) juror dishonesty; (2) shackling during trial; (3) ineffective assistance of counsel in guilt phase (failure to object to judge's inquiry during voir dire and to admission of statement into evidence); (4) ineffective counsel in sentencing phase (failure to present mitigation evidence); (5) mental retardation which precludes the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L. Ed. 2d 335 (2002); (6) use of avoiding arrest aggravator; (7) disproportionate sentence since he was not the trigger man, and (8) cumulative error. We grant leave for Doss to proceed in the Grenada County Circuit Court for an evidentiary hearing on the merits of his claim of ineffectiveness of counsel during the mitigation or penalty phase of his trial and his claim of mental retardation, pursuant to *Atkins* and the standards and procedures set forth in *Chase v. State,* 873 So. 2d 1013 (Miss. 2004). We deny Doss's application in all other respects.

## ANALYSIS

### I.     Juror dishonesty.

3

¶3.     Doss first argues that during voir dire, prospective juror Lewis Paul Griffin failed to answer a question which would have resulted in his being challenged had he answered.  The trial judge asked the following:

> I was about to ask the question, how many of you, if any, have ever had an occasion where you might have used any of these men to represent you or any member of your family.  Now, remember, that would mean that the District Attorney might have had occasion in his official capacity to prosecute a crime, which he prosecutes in the name of the state of Mississippi, but it might have involved a member of your family as a victim. You may have come in contact with them because of that.  In the case of Mr. Bailey [Doss's attorney], of course, it might have been either a plaintiff or defendant.  Have they ever represented you or a member of your family?

Randall O. Poss stated that he had used District Attorney Doug Evans "as a personal attorney to draw up wills and such" but stated that would not pose a problem for him.  Barbara Ann Spence stated that she had "used Mr. Evans for some things," that these matters had been concluded and would pose no problem. Jesse Fields stated that Evans helped his father with a bad check.  The trial judge then asked whether any of the attorneys had been on the "opposite side," stating that "in the District Attorney's case that would mean he might have prosecuted you or a member of you family.  Anyone at all?  I take it then that none of you have ever had an occasion where these men have been on the opposite side.  They have never prosecuted you or a member of your family that might have been charged with a felony, and they have never represented the opposite side in a civil matter, either."  Lewis Paul Griffin did not answer and eventually he served on the Doss jury.

¶4.     A couple of months earlier, in January 1993, Frederick Bell, Doss's co-defendant, had his separate murder trial in Grenada County, and Griffin was also in that venire.  There, the same trial judge conducted voir dire and asked the same type questions, but after one juror stated that District Attorney Evans was

"our lawyer," the trial judge added: "I wanted to say, also, that, of course, he could have represented you in private practice in some manner, and I want to know that, as well." At that point, Griffin stated that Evans represented him in a custody case during a divorce, but that would make no difference to him if selected as a juror in Bell's case. Nevertheless, Bell's defense counsel peremptorily struck Griffin.

¶5.     Doss now argues that if Griffin had answered truthfully during voir dire in his case, as he did in the Bell case, counsel for Doss would have stricken him from the venire. Doss cites *Odom v. State*, 355 So.2d 1381, 1383 (Miss. 1978), where this Court stated:

> [W]e hold that where, as here, a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited.[FN1] If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond.

Odom was granted a new trial where a juror failed to reveal that his brother was one of the investigating officers in the murder Odom was charged with. *See also Laney v. State*, 421 So.2d 1216 (Miss. 1982) (murder conviction reversed where juror failed to mention relatives who were law enforcement officers); *Atkinson v. State*, 371 So.2d 869 (Miss. 1979) (manslaughter conviction arising from car crash reversed where juror failed to mention two relatives killed in car accidents); *Brooks v. State*, 360 So.2d 704 (Miss. 1978) (assault conviction reversed on several grounds, including where juror failed to mention family member was victim of crime); *Dase v. State*, 356 So.2d 1179 (Miss. 1978) (murder conviction reversed where juror failed to mention son's murder one month before trial).

5

¶6.    In the present case, the State first asserts that "this information [that Griffin was peremptorily struck during the Bell trial due to the fact that the D.A. had been his attorney in a civil matter] was available to Petitioner and [his attorney] Bailey" at trial, and argues that there was nothing wrong with Griffin not supplying this information because he wasn't specifically asked to. The State contends that the circuit court only asked whether they had been involved in some matter with Evans in his official capacity as district attorney, and indicated that any other answers were "unnecessary" and "unimportant." Additionally, the State argues that the circuit court asked a different question during Bell's trial, and that when Griffin did provide the information in Bell's trial, the court noted that the answer did not fall within the scope of the question.

¶7.    The transcripts of both voir dires partially support the State's argument. In the Bell trial, when one potential juror volunteered that Evans had been his lawyer outside his district attorney capacity, Judge Sumner stated that he should have made that part of his question and he wanted to know that. In the Doss trial, the parties volunteered their connections to Judge Sumner, but he did not clarify the matter as he had done in the Bell voir dire. If D.A. Evans's previous civil litigation clients were a relevant matter during voir dire in Frederick Bell's case, then they were also a relevant matter during Anthony Doss's trial two months later. It is difficult to understand why, notwithstanding the difference in the actual wording of the questions, Griffin volunteered this information at Bell's trial and not at Doss's trial, where other jurors volunteered such information. The State also argues that Doss shows no proof that Griffin's previous association with Evans was the reason he was stricken from Bell's jury. There would be, however, no such proof with a peremptory challenge absent some kind of statement from Bell's attorney.

¶8.    The State also argues that, despite defense counsel Bailey's sworn assertion to the contrary, it is

6

doubtful that Bailey would have stricken Griffin had he known this information. The State points to jurors Randle Poss, Barbara Spence and Jesse Fields as jurors who provided much better reasons on voir dire to question their fairness and were not peremptorily challenged. A review of voir dire shows that Randle Poss was the victim's Sunday School teacher for two or three years and the victim's grandmother was a baby sitter for Poss's family for two or three years. Barbara Ann Spence stated that she knew the Bells casually from softball practices, and that their children went to school together, and her daughter and Mr. Bell's son were very close. She also stated that she had heard some statements about the case from the victim's father. Jesse Fields stated that his mother worked closely with Mrs. Bell, and he knew the victim. The State further argues that Griffin would take mercy into account when rendering his verdict.

¶9. Doss argues that this is irrelevant because Jesse Fields was stricken for cause because he stated that he would automatically vote for the death penalty in case of a conviction of capital murder, and that defense counsel ran out of peremptory challenges on juror 44, whereas jurors Poss and Spence were numbers 73 and 83. The State's argument that Griffin would have taken mercy into account is based on Griffin's failure to respond to defense counsel's question as to how many of the jurors felt that mercy should have nothing to do with their verdict.

¶10. The *Odom* test provides that the trial court should, on a motion for new trial, determine whether the question propounded to the juror was relevant, unambiguous and whether the juror had substantial knowledge of the information sought to be elicited. The court then determines whether prejudice can be inferred from the juror's failure to respond. The record shows that the second requirement, that of the questions being unambiguous, was not met in Doss's trial. The judge may have been only interested in jurors who had contact with D.A. Evans in his official capacity, or he may also have been trying to elicit

7

information about contacts that jurors may have had in other aspects of Evans's legal practice. It is impossible to tell, from the circuit court's questions, or from the judge's failure to clarify the matter, as he had done earlier in the Bell trial. Since all the relevant questions from the *Odom* test cannot be answered in the affirmative, we do not reach the question of whether prejudice to the defendant can reasonably be inferred. "If prejudice reasonably could be inferred, then a new trial should have been ordered. It is, of course, a judicial question as to whether a jury is fair and impartial, and the court's judgment will not be disturbed unless it appears that it is clearly wrong. *Odom*, 353 So.2d at 1383. This issue is without merit.

### II.    Must the conviction be reversed because the defendant was shackled during the trial in a manner apparent to the jury?

¶11.    Doss next argues that he was shackled throughout his trial, that at least four jurors saw him, and since there was no finding or reason or justification for this stated in the record, he was prejudiced and his rights violated. Doss joined in several motions filed by his co-defendant, Frederick Bell, in a pretrial hearing on November 30, 1992. One of the motions was a motion to preclude the sheriff's department from bringing Frederick Bell [or Anthony Doss] into court in shackles, and to limit the number of uniformed officers in the courtroom. The circuit court ruled:

> I require that they have some restraint in view of representation being made to the Court, and I believe it being undenied that they are under charges from other jurisdictions also, and, therefore, they will be restrained. However, I will ask the Sheriff to do so in a manner which will be least obtrusive to the jury or anyone else involved in the trial. I will not limit the number of uniformed officers, at this time, in the courtroom. I may do so later when I see how many we've got.

This issue was not raised on direct appeal.

¶12.    Doss also relies on four "affidavits" to argue that four jurors saw him in shackles in the courtroom.

8

An examination of the exhibits shows that two are statements by interviewers working for the defense team as to what the former jurors, Susan Honeycutt and Joycelyn Clark Mitchell, said. In other words, it was plainly hearsay. The other two statements, apparently made by Maxine Brock and S.D. Booker, the former jurors themselves, are not notarized. *See Russell v. State*, 849 So.2d 95, 109 (Miss. 2003) (affidavit is a sworn statement in writing made before an authorized individual).

¶13.   Doss cites numerous cases from the U.S. Supreme Court, federal courts and courts of this and other states on shackling, but the primary rules to be taken from these cases are the following: shackling a defendant is allowable within the discretion of the court, but should be used as a last resort. It is allowable to protect the decorum or dignity of the trial process or the safety of trial participants or prevent escape. One of the oldest and most cited cases from this Court dealing with shackling is *Rush v. State*, 301 So.2d 297, 300 (Miss. 1974), where this Court stated:

> [Rush] contends that being exposed to the jurors in handcuffs denied him a fair trial. It is a common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner. Whether that ought to be done is in the discretion of the court, based upon reasonable grounds for apprehension. But, if this right of the accused is violated, it may be ground for the reversal of a judgment of conviction. *Marion v. Commonwealth*, 269 Ky. 729, 108 S.W.2d 721 (1937).
>
> However, the failure, through an oversight, to remove handcuffs from a prisoner for a short time or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for reversal. *Marion, supra*.
> Under the facts and circumstances of this case, we are of the opinion that the action of the deputy sheriff in bringing the appellant into the courtroom in the presence of the prospective jurors while handcuffed did not result in any prejudice to his right to a fair trial. *See United States v. Hamilton*, 444 F.2d 81 (5th Cir. 1971); *Williams v. Commonwealth*, 474 S.W.2d 381 (Ky.1971).

¶14.   The State argues that because this argument could have been raised on direct appeal and was not,

it is now procedurally barred. We agree. *See **McGilberry v. State***, 843 So.2d 21 (Miss. 2003) (claim based on shackling in death penalty post-conviction case was barred under Miss. Code Ann. § 99-39-21(1) for failure to raise at trial or on direct appeal). Even if this Court did reach the merits of this argument, there is no prejudice to Doss, based on the statements offered by him from: Honeycutt ("Doss was wearing street clothes, but because he could not walk normally she thought he was wearing shackles"); Mitchell ("[Doss] had shackles on his legs. He was very quiet. He obviously couldn't hurt anybody under the circumstances"); Brock ("I do remember that he had shackles around his ankles. I don't think they ever took the shackles off. He wore them the entire trial"); and Booker ("Anthony was wearing casual clothes during the trial. He was also wearing chains on his wrists and legs"). Even though some of the jurors did notice that Doss was shackled, it appears it had no prejudicial effect. Additionally, neither Doss nor the State cites even one case where this Court has reversed a conviction based on the jury seeing someone shackled before or during a trial. This issue is procedurally barred and is without merit.

**III. Was trial counsel ineffective at both the guilt and punishment phases for failing to raise the various issues upon which this court imposed a procedural bar on direct appeal?**

¶15.     This Court stated the following about ineffective assistance of counsel in ***Burns v. State***, 813 So.2d 668, 673 (Miss. 2001):

> The standard for determining if a defendant received effective assistance of counsel is well settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient *and* that the deficiency prejudiced the defense of the case. ***Id.*** at 687, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from

10

a breakdown in the adversary process that renders the result unreliable." ***Stringer v. State****,* 454 So.2d 468, 477 (Miss.1984) (citing ***Strickland v. Washington****,* 466 U.S. at 687, 104 S.Ct. 2052). The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. ***Id.***

¶16.    The entirety of this issue as presented by Doss in his motion to vacate judgment and sentence, is as follows:

On direct appeal, this Court imposed procedural bars with respect to a number of claims that trial counsel failed to preserve. Counsel's errors in that regard constitute ineffective assistance of counsel. This claim is raised under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, §§ 14, 26, and 28 of the Mississippi Constitution.

This Court's opinion on Doss's direct appeal contains 17 instances where this Court found that the procedural bar was applicable because of defense counsel's failure to raise an objection at trial, or failure to raise the same objection at trial he was attempting to raise on direct appeal. In 15 of these instances, the Court also discussed the merits of the issue and found that the issue was without merit. If the issue was without merit, then defense counsel would not be ineffective under the two part test set forth in ***Strickland v. Washington***, which requires (1) deficient conduct and (2) prejudice to the defendant caused by the deficiency.

¶17.    There were two issues where this Court found a procedural bar and did not reach the merits. The first was where the trial judge attempted to determine if anyone on the jury venire might possess any racial bias because of the race of the defendant and victim. Doss admitted that the inquiry was proper, but asserted that the way in which the trial judge worded the question would actually discourage someone from revealing such a bias. This Court found: "After reading the transcript in its entirety, it appears to this Court that the trial judge had the best of intentions in trying to discover  anyone on the venire that was not

11

impartial, although the manner in which the inquiry was done may have had a chilling effect." ***Doss***, 709 So.2d at 382.

¶18.    The other instance involved a transcript of Doss's statement made to police in which another shooting, besides that of Robert C. Bell, was mentioned. This was the shooting of Tommy White, which took place hours after the shooting of Robert Bell. Doss eventually pled guilty to second degree murder in connection with the shooting of White. In the statement Doss was asked if the gun "they" used to shoot "this guy up here in Memphis" was the same gun that was taken from the Sparks store. Doss said he wasn't sure, but it was similar. Doss denied getting any additional guns after they had left the Sparks store. This statement was admitted into evidence.

¶19.    In neither instance does Doss demonstrate that his counsel's failure to timely object, or to object with specificity,  so undermined the proper functioning of the adversarial process that the trial did not produce a just result, or prejudiced his defense of the case as required under the second prong of ***Strickland***. As we said in ***Davis v. State***, 743 So. 2d 326, 334 (Miss. 1999):

> To determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Mohr v. State***, 584 So. 2d 426, 430 (Miss. 1991). . . . There is no constitutional right then to errorless counsel. ***Cabello v. State***, 524 So. 2d 313, 315 (Miss. 1988). . . . If the post-conviction application fails on either of the ***Strickland*** prongs, the proceedings end. ***Neal v. State***, 525 So. 2d 1279, 1281 (Miss. 1987).

This issue is without merit.

**IV.    Must the sentence be vacated because of ineffective assistance of counsel in the penalty phase of the trial?**

12

¶20.    Doss relies first on the affidavit of his trial attorney who states that: Doss's was the first case he had defended where the death penalty was sought; he did not seek any school, medical, mental health or other records, because he did not realize the importance of the records in presenting a defense during the sentencing phase; he did not seek advice from a mental health expert, funds for a mental health expert or any kind of mental health evaluation; and he did not obtain any records resulting from the investigation of criminal charges against Doss in Shelby County, but he did obtain the indictment and judgment in that case. Bailey also obtained the appointment of an investigator, Kelvin Winbush, who was also the investigator for Doss's co-defendant, Frederick Bell. Bailey stated that Winbush told him he had interviewed: Doss's aunt, Lillie Moore; Doss's sisters, Lucretia Monger and Mavis McCaster; Doss's brothers, Marvin Doss and Randy Doss; and John Westmoreland and that all stated that Doss was a good and/or quiet person who got involved with the wrong crowd. Bailey did not follow up with these witnesses or ask them to testify at the sentencing phase. Bailey stated that Winbush told him he had contacted two teachers in Bruce, a Mrs. Parker and a Coach Smith, but it was questionable as to whether these people actually knew Doss, or whether they had mistaken him for Frederick Bell. Bailey did not realize that a conflict might result from using Winbush, where one of Bailey's potential defense strategies was to blame Bell as the instigator of the shooting. Bailey states that he interviewed only Doss's mother and an aunt for a few minutes. Bailey states that he felt he did a good job in defending the case at the guilt phase, but that he did not know what he was doing as to the sentencing phase.

¶21.    Kelvin Winbush's affidavit states that this was his first mitigation investigation, and that he was also the investigator for Frederick Bell. Winbush identified Lillie Moore, Lucretia Monger, , Mavis McCaster, , Marvin Doss, , Randy Doss, , and John Westmoreland, a friend, as favorable mitigation witnesses.

13

Winbush also identified Coach Smith, a teacher and coach in Bruce, as someone who knew Anthony and said he "behaved fairly well for the most part." Winbush stated that he gave Bailey contact information for some of the witnesses, and Bailey knew Winbush had contact information for them all. Winbush says that he was never asked to follow up with the witnesses, to arrange for subpoenas, to arrange for their presence at trial, or to look for additional witnesses after Winbush's initial report. He was also not asked to do any investigating in Chicago.

¶22.    Carolyn Watkins, the public defender who handled Doss's murder charge in Shelby County, states in an affidavit that she obtained school records for Doss from Chicago; Doss's medical records from Chicago, including records involving a 1986 head injury; and the 1988 psychological report done at the University of Mississippi. She states that Lee Bailey never requested these records.

¶23.    Doss attaches the affidavits of his mother, Sadie Doss; Verlene Forest Williams, a woman who became friends with Doss during his imprisonment; Carolyn Phillips, an aunt; Ernestine Williams, an aunt; Lucretia Monger, ; Randy Doss, ; Roselyn Monette Jackson, Doss's aunt; Mary Jennings, Doss's aunt; John Westmoreland, who had been married to Doss's aunt; Annette James, a girlfriend; Marvin Doss, Anthony's half-brother; Q.T. Doss, a family member; Lillie Moore, ; Sandra Price, a daughter of Sam "Joe" Brown, who lived with Doss's mother in Chicago; Chantay Price, Sandra Price's sixteen-year-old daughter; Varnado McDonald, step-sister of Lucretia Monger; Carrie Cole, Doss's aunt; Rosie Caldwell, a friend of Doss's mother; and Sam Phillips, Doss's biological father. The affiants say that Doss was shy and quiet, not a violent person; that there were times when Doss seemed to go into a seizure or trance of some kind, when he did not respond to people; that he had mental or medical problems that began with his mother's drinking and drug use during her pregnancy with him, followed by lead poisoning and head injuries during

14

Doss's childhood; that mental illness seemed to run in the Doss family; that Doss was easily led by Frederick Bell, who was a bad, violent person and came from a violent family; that Doss began to run with a bad crowd when he moved from Chicago to Mississippi; that Doss's birth and upbringing in Chicago were riddled with crime, drug abuse and poverty. Specifically mentioned and blamed for much of the misfortune suffered by Doss and his family in Chicago was Sam Brown, who lived with Doss's mother. Doss apparently believed for much of his early life that Sam Brown was his biological father. According to various affidavits, Sam Brown was violent and abusive toward Doss, his mother and the rest of the family; he took what little money the family had to buy drugs and gamble; and he sold drugs and introduced the children in the family to drugs.

¶24. In *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), the United States Supreme Court found that prejudice resulted from counsel's failure to discover and present mitigating evidence. Doss relies on *Davis v. State*, 743 So.2d 326, 329 (Miss. 1999), in which this Court stated: "[W]hile attorneys will be granted wide discretion as to trial strategy, choosing defenses and calling witnesses, a certain amount of investigation and preparation is required. Failure to call a witness may be excused based on the belief that the testimony will not be helpful; such a belief in turn must be based on a genuine effort to locate or evaluate the witness, and not on a mistaken legal notion or plain inaction." This Court granted Davis leave to proceed on that issue where his attorney called three witness in sentencing, a friend of Davis's, and Davis's sister and mother. Davis alleged that his trial attorney did not call available character witnesses and did not prepare the ones he did call.

¶25. Doss also relies on *Woodward v. State*, 635 So.2d 805 (Miss. 1993), where this Court vacated Woodward's death sentence on post-conviction and remanded for a new sentencing hearing, and

15

*Leatherwood v. State*, 473 So.2d 964 (Miss. 1985), where this Court, on post-conviction, remanded the question of ineffective assistance of counsel to the circuit court for an evidentiary hearing. In both cases it was alleged that defense counsel had failed to properly investigate, locate and prepare witness for sentencing.

¶26.    Doss finally cites ***Burns v. State***, 813 So.2d 668 (Miss. 2001). Burns alleged that his defense counsel was ineffective for failure to call any witnesses during the sentencing phase. Burns presented affidavits from several persons who stated that they would have been willing to testify for Burns if they had been called, including his mother, sister, two co-workers and a former employer. The Court noted that "[s]ome of the evidence as proposed in the affidavits probably would not have aided the defense," such as evidence about violent behavior and drug use by Burns, and it was possible that the failure to call such witnesses was a matter of trial strategy. *Id.* at 678. Apparently no testimony concerning this decision from trial counsel was provided, as this Court found that it should grant leave to proceed on this issue "absent explanatory testimony." *Id.* at 679.

¶27.    The State argues that Doss's supporting affidavits are contradicted by earlier testimony, contradict each other, are irrelevant, facially false, and insufficient to support Doss's claim. The State correctly points out numerous problems with the affidavits, including:  Anthony Doss and his mother had numerous opportunities to tell the horror stories about life in Chicago earlier, and never did so until after his conviction; several persons now testify that Anthony wanted to return to Chicago just before the murder but was unable to; Anthony Doss and his mother never testified about any family history of mental illness until after his conviction; Sadie Doss never previously testified about any personal drug abuse history or

16

problems with Anthony's delivery; Sadie Doss never testified about the terrible treatment she, Anthony and the rest of the family endured at the hands of Sam Brown, but falsely told the jury at Anthony's trial that Sam Brown was Anthony's father.

¶28.    The State cites a psychological report issued by the University of Mississippi after Doss was tested there in 1988. In that report Sadie Doss told the interviewers that her pregnancy and Anthony's delivery was normal, that there was no history of mental illness in the family, that there was no history of alcohol or drug abuse in the immediate family; and that the first of Anthony's three most important wishes was to return to Chicago. The State points out affidavit testimony supplied by Doss which supports his desire to return to Chicago. The State also points out that Doss does not supply any police or medical reports to support the stories of assaults against the family by Sam Brown and others, or the stories of illness and drug abuse. The State points out these inconsistencies and some untruths in the affidavits, such as citing Sandra Price's affidavit as evidence of the family's history of mental problems, where Sandra Price, the daughter of Sam Brown, and Anthony Doss are not blood relatives.

¶29.    The State argues that defense counsel Bailey's opinions about his own performance are irrelevant because (1) effective assistance of counsel is based on an objective standard and (2) such evidence is not newly discovered evidence. *See In re Hill*, 460 So.2d 792 (Miss. 1984). While Bailey's opinions about his own performance may not be relevant, there is no doubt that his many statements about what he did not do, because he did not think it would be helpful, and that he did not know enough about death penalty litigation to know better, and that his decisions were not a part of trial strategy, are relevant. Doss does not allege that Bailey's statements are newly discovered evidence because there is no such need at this point. Doss is not trying to get past a procedural bar.

17

¶30.     The State sums up its argument by citing *Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000), for the proposition that counsel cannot be ineffective for failure to interview or call witnesses when those witnesses will not cooperate; *Chase v. State*, 699 So.2d 521 (Miss. 1997), where this Court stated that an attorney was not ineffective where a witness supporting a defense motion refused to appear and the attorney did not attempt to force the witness to appear; *Brown v. State*, 798 So.2d 481, 496 (Miss. 2001), where this Court stated that the duty to investigate and prepare is not limitless; *Washington v. Watkins*, 655 F.2d 1346 (5th Cir. 1981), which finds that, when considering a claim of ineffective assistance, one must take into account all circumstances, but only as known to counsel at the time in question; and *Ladd v. Cockrell*, 311 F.3d 349 (5th Cir. 2002), which states that, in the face of overwhelming evidence, modest mitigation evidence to the contrary becomes irrelevant.

¶31.     What the State does not attempt to do is distinguish, or even mention, *Davis*, *Woodward*, *Leatherwood* or *Burns*, the cases from this Court cited by Doss. The State points out that some of what is included in Doss's affidavits is not helpful to him, but this did not prevent this Court from granting relief in *Burns*. We acknowledge that many discrepancies exist among the affidavits presented by Doss in support of this issue. However, we conclude that Doss has made a sufficient showing under the *Strickland* test that Bailey's efforts fell short of the efforts a counsel should make in a death penalty sentencing trial, so as to entitle Doss to an evidentiary hearing on this claim in the circuit court. This was Bailey's first death penalty case, and he admitted that he did not know what he was doing in the sentencing phase. When counsel makes choices of which witnesses to use or not use, those choices must be made based on counsel's proper investigation. Counsel's minimum duty is to interview potential witnesses and

18

to make an independent investigation of the facts and circumstances of the case. *Woodward*, 635 So.2d at 813 (Smith, J., concurring in part).

¶32.   Under *Strickland*, "[t]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances" and once a deficient performance is shown "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors,  the result of the [sentencing phase] would have been different." *Strickland*, 466 U.S. at 694.   In the present case, the inquiry is whether the sentence would have been different if mitigating evidence which was available, but not used, had been presented.   Doss should have the opportunity to present  evidence to the trial court in support of his claim that his counsel's failure to investigate and present available evidence in mitigation amounted to ineffective counsel.

<h3 style="text-align:center">V.      Must the sentence be vacated under <em>Atkins v. Virginia</em>?</h3>

¶33.   Doss argues that he is entitled to have his sentence vacated because he is mentally retarded and his execution is prohibited under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).  Doss claims that *Atkins*  is an intervening decision which allows him to proceed in the trial court.

¶34.   Doss is correct that *Atkins*  is an intervening decision; however, the United States Supreme Court did not define who is or is not mentally retarded for purposes of eligibility for a death sentence, but instead "leave[s] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 122 S. Ct. at 2250.  After *Atkins*  was decided in June of 2002, this Court considered  and developed   the standards and procedures which should be used in determining the proper disposition of claims of mental retardation, in a series of decisions including *Foster v. State*, 848

So.2d 172 (Miss. 2003), *Russell v. State*, 849 So.2d 95 (Miss. 2003), *Goodin v. State*, 856 So.2d

267 (Miss. 2003), and *Chase v. State,* 873 So. 2d 1013 (Miss. 2004), with *Chase* now being the

seminal case by which we measure claims of mental retardation.

¶35.    In *Chase*, we noted that the *Atkins* majority cited with approval two specific, almost identical,

definitions of "mental retardation."

> The first was provided by the American Association on Mental Retardation (AAMR):

>> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self- direction, health and safety, functional academics, leisure, and work, Mental retardation manifests before age 18.

> *Atkins,* 536 U.S. at 308 n. 3, 122 S.Ct. 2242, citing Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992). The second was provided by The American Psychiatric Association:

>> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000).

> *Id.*

>> The Diagnostic and Statistical Manual of Mental Disorders, from which the American Psychiatric Association definition is quoted, further states that "mild" mental retardation is typically used to describe persons with an IQ level of 50-55 to

approximately 70. Id. at 42-43. The Manual further provides, however, that mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75. [FN18] Id. at 40. Additionally, According to the Atkins majority, "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." Id. citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds 7th ed.2000) (emphasis added).

These definitions were previously adopted and approved by this Court in *Foster v. State*, 848 So.2d 172 (Miss.2003). This Court further held in *Foster* that
the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering.... Foster must prove that he meets the applicable standard by a preponderance of the evidence.... This issue will be considered and decided by the circuit court without a jury.

*Id.* at 175.

These definitions, approved in *Atkins*, and adopted in *Foster*, together with the MMPI-II, [FN19] provide a clear standard to be used in this State by our trial courts in determining whether, for Eighth Amendment purposes, a criminal defendant is mentally retarded. The trial judge will make such determination, by a preponderance of the evidence, after receiving evidence presented by the defendant and the State.

*Chase*, 873 So.2d at 1027-28.

¶36. Further, in *Chase* we also adopted the procedures to be used in determining mental retardation,

as follows:

Having established the definition of mental retardation to be used for purposes of Eighth Amendment protection to mentally retarded defendants, we now turn to the procedure to be used in reaching a determination of mental retardation.
We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:

1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
2. The defendant has completed the Minnesota Multi phasic Personality

21

Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.

Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.

Thereafter, the State may offer evidence, and the matter should proceed as other evidentiary hearings on motions.

At the conclusion of the hearing, the trial court must determine whether the defendant has established, by a preponderance of the evidence, that the defendant is mentally retarded. The factors to be considered by the trial court are the expert opinions offered by the parties, and other evidence if limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in *Atkins*, and discussed above. Upon making such determination, the trial court shall place in the record its finding and the factual basis therefor.

*Chase*, 873 So.2d at 1029.

¶37. Although *Chase* was in a somewhat different procedural posture than the present case, the underlying evidentiary requirements for Eighth Amendment protection from execution remain the same. Doss must provide evidence from at least one expert, qualified as described above, who opines, to a reasonable degree of certainty, that: (1) Doss has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that he is mentally retarded, as defined herein.

¶38. Doss has more than met the threshold requirement to be heard on the *Atkins* issue, based on the neuropsychological evaluation of Dr. Michael M. Gelbort, and the affidavits of Dr. James R. Merikangas and Jeffrey Eno, a clinical and social worker.

¶39. Dr. Gelbort examined Doss in Parchman in May 2003, and reported certain family medical and

22

traumatic events. He administered the Wechsler Adult Intelligence Scale - III, Wechsler Memory Scale - III subtests, Wide Range Achievement Test - III, Lateral Domination Examination, Strength of Grip, Trail Making Test, Category Test, items from the Luria Nebraska, and diagnostic interview with mental status testing. Doss had test scores 68 verbal, 79 performance, and 71 IQ. Dr. Gelbort states that "[t]hese scores are virtually identical to those obtained in the distant past and lend weight to the opinion that the patient put forth appropriate effort, as well as that his intellectual functioning is in the borderline mentally retarded range and that he qualified, in terms of intellectual impairment, for a diagnosis of Mental Retardation."

¶40.    Dr. Merikangas, a physician specializing in neurology and psychiatry, provided an affidavit, dated August 14, 2001, in which he stated that he had been provided with a psychological report on Doss prepared by the University of Mississippi Psychological Services Center based on testing of Doss conducted in July and August 1988. Dr. Merikangas states that this report by itself "suggests organic brain damage and mental retardation that is important mitigating evidence." Dr. Merikangas's ultimate conclusion was that a neuropsychiatric evaluation was necessary.

¶41.    Jeffrey Eno, a clinical and forensic social worker who develops mitigation evidence for criminal defendants, states in his affidavit that he was asked to investigate and evaluate Doss's social history background and to highlight the influences that have shaped his development. Eno states that this information was readily available at the time of Doss's original trial and sentencing hearing. Eno then provides a life history of Doss, including his prenatal history, the poverty of his youth, his exposure to lead paint chips, his violent, physically abusive step-father, his growing up in a dangerous area of Chicago, his physical injuries, his exposure to violent crimes and criminals, the history of mental problems suffered by

23

other members of the family, his substance abuse and exposure to drug dealers and his psychiatric history.

¶42. The State denies that Anthony Doss is retarded, relying heavily on the same psychological report on which Dr. Merikangas relies, performed on Doss at the University of Mississippi Psychological Services Center in July and August 1988. The State points out that Doss, fifteen at the time, was being evaluated because he had been placed on probation in April 1988 by the Calhoun County Youth Court due to his pleading guilty to charges of breaking and entering, possession of marijuana and causing a family disturbance. This evaluation took place less than three years before the shooting of Robert C. Bell. Doss was administered the Wechlser Intelligence Scale for Children - Revised, the Millon Adolescent Personality Inventory, the Wide Range Achievement Test - Revised, the Bender Motor Gestalt Test, and a clinical interview.

¶43. The State further argues that there are numerous contradictions and inconsistencies between the version of Anthony Doss's life as he and his family now are reporting it versus their description in 1988.[1] The University of Mississippi Report states that Doss's mother, Sadie, reports that her pregnancy and Anthony's delivery were normal and uneventful; Sadie Doss reported that there was no history of mental illness in the family; that Anthony and his mother and brother moved to Calhoun City so that Sadie could help her adult daughters with their childcare; Sadie Doss stated that she only drinks an occasional beer and there was no history of alcohol or drug abuse in their immediate family; and that Anthony told the interviewers that his most important wish was to go back to Chicago. The State reports that this all

---

[1] Based on this 1988 report and other inconsistencies in Doss's claim, Justice Easley writes in his separate opinion that the "majority's conclusion to grant Doss leave to proceed in the trial court on this issue is flawed." However, that is precisely the procedure established by this Court in *Chase*, which allows the State, as well as Doss, to offer evidence in support of their respective arguments.

contradicts Doss's allegations now, that being born, growing up and living in Chicago was a horrible, dangerous, traumatic experience. Nowhere in the 1988 report is Sam Brown, the violent, abusive stepfather from Chicago, mentioned.

¶44. The State argues that Doss had been taking special education courses, but also had been mainstreamed into some regular classes with some good results, making B's, C's and D's. After this Doss starting skipping school regularly. Doss's test results on the Wechlser were verbal scale IQ of 67, performance scale IQ of 80 and a full scale IQ of 71. The State argues that these scores are too high to denote mental retardation. The Psychological Report provides a diagnostic impression of "conduct disorder, socialized, aggressive." The Report never states that Doss is retarded.

¶45. The State finally argues that, if this Court does grant Doss leave to proceed in the trial court on this issue, *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), is not applicable to his claim. *See Russell v. State*, 849 So.2d at 148. We agree.

¶46. The State raises numerous legitimate questions concerning Doss's claim, including his supporting expert testimony, the alleged facts of his upbringing, and the timing of his claim of retardation. All might be available to impeach Doss and undermine his claim, but this does not prevent Doss from presenting his claim before the trial court. We hold that Doss is granted leave to present his *Atkins* claim before the trial court.

> **VI.    Use of the "avoiding arrest" aggravating circumstance.**

¶47. Doss next argues that it was error to allow the jury to consider the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest. This issue was raised on direct appeal and considered by this Court as follows:

Doss argues (1) that the evidence did not support the giving of sentencing instruction No. C-1 setting forth the aggravating circumstance that the murder was committed for the purpose of avoiding arrest and (2) that no accompanying limiting instruction was given.

The State asserts that this Court, in *Chase* held that a limiting instruction on this type of aggravator is not necessary. *Chase* clearly does dispose of this portion of Doss's argument, rendering it without merit. *See Evans v. Thigpen,* 631 F.Supp. 274, 283 (S.D.Miss.1986), *aff'd* 809 F.2d 239 (5th Cir.1987); *Gray v. Lucas,* 677 F.2d 1086, 1109-1110 (5th Cir.1982).

The State next asserts that the evidence supported the instruction. It points to the following facts. (1) Doss admittedly went into the store with a gun to rob it. (2) Freddie had said before entering the store that they were "going to go in shooting." (3) Doss supposedly said "Let's go. Let's go do it" immediately before entering Sparks. (4) Bell hollered as he was shot and had several shots through his hands indicating that he was neither armed nor posed a threat to the robbers' escape. (5) According to Coffey, once Doss was on his way to Memphis, Doss was ready to go back and kill James to eliminate a possible witness. And finally, (6) Doss admitted that he went to Memphis so that he would not get caught. [FN27]

FN27. Facts 2, 3, and 5 were denied by Doss during trial.

Doss responds in his reply brief with the argument that all of the above-mentioned facts exist in any felony-murder case and that there are no "substantial reasons" to support the aggravating circumstance in this case. We find Doss's argument unpersuasive as the aforementioned facts, particularly # 4 and # 6, support the giving of the instruction. This argument is without merit.

*Doss*, 709 So.2d at 390-91.

¶48.     Doss relies on this Court's decision in *Taylor v. State*, 672 So.2d 1246 (Miss. 1996), in which Taylor was convicted for murdering his stepdaughter Mildred Spires. Taylor challenged the validity of several aggravating factors, including avoiding or preventing a lawful arrest. This Court found the following:

(4) *Avoiding or Preventing a Lawful Arrest.* Taylor claims that the State adduced no evidence to support the proposition that the murder was committed for the purpose of avoiding or preventing the detection and lawful arrest of the defendant. The Court has said that the "avoiding arrest" aggravating circumstance is justified where:

26

there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities.

There is absolutely no evidence that a desire to avoid apprehension and arrest was a substantial reason for the killing of Mildred Spires. This instruction was improperly given to the jury as an aggravating circumstance.

*Taylor*, 672 So.2d at 1275. In addition, a partially concurring opinion added:

However, the evidentiary basis for avoiding or preventing a lawful arrest is without any testimony. The timing of the actions of a person's spray painting the victim's automobile is not in evidence. To be an aggravating factor, Miss.Code Ann §§ 99-19-101(5)(e) states:

The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

For this factor to apply, the act of avoiding or preventing an arrest or escaping had to have occurred when the murder was committed, and it must have been a motivating factor in the killing. The dissent suggests that the spraying of the car was such an act, but has no evidentiary basis for the time of the action. Assuming that the defendant was the actor, the dissent suggests that the spray painting occurred after Taylor was told by Detective Knowles that fingerprints would be found on the car. It is my view that the above statutory language requires that the actual killing be done in avoidance of the arrest. A later act to avoid arrest does not meet the statutory requirement for this aggravating factor. The record here is without substantiation on this factor; therefore, there is error in this sentencing hearing on this point and that error requires a new hearing.

*Taylor*, 672 So.2d at 1279 (Prather, J., concurring in part).

¶49.  Doss argues that because this Court did not consider *Taylor* when it decided this issue on direct appeal, the claim is not procedurally barred. Doss argues that this Court in *Taylor* "restricted the kind of evidence that may be used to support the submission of the aggravating factor of avoiding arrest," particularly citing Justice Prather's partial concurrence. Doss then argues that there was insufficient evidence to support the "avoiding arrest" aggravating factor in his case because items 5 and 6 concern

27

Doss's attempt to avoid arrest after the murder and are irrelevant under this Court's decision in *Taylor*. Doss argues that there was much more evidence in *Taylor* concerning an effort to avoid arrest after the murder of Mildred Spires. Doss argues that item 4 was not applicable in light of *Taylor*, as Mildred Spires was not armed and there was no indication she posed a threat to Taylor's escape. As this Court found Bert Bell similarly situated, Doss argues that the factor supports his argument. Doss argues that the rest of the enumerated facts were not sufficient to support the aggravator.

¶50. The State first answers that the issue was raised and decided on direct appeal and is barred by res judicata. The State also argues that *Taylor* was handed down by this Court on April 25, 1996, whereas *Doss* was initially decided on May 23, 1996, and handed down in its final form on December 15, 1997, so Doss could have relied on *Taylor* before this Court.

¶51. The State further argues that this analysis is dependent on the facts of each case, and under the facts of this case, the jury was entitled "to make a logical connection between the injuries Bert Bell suffered and the find that Doss murdered Bell in order to avoid arrest." The State also contends that Justice Prather's partially concurring opinion is not controlling, and this Court has found several times since *Taylor* that actions taken after the murder may be taken into consideration with this particular aggravator. *See Manning v. State*, 735 So.2d 323 (Miss. 1999) (lied to police about his presence); *Woodward v. State*, 726 So.2d 524 (Miss. 1997) (disposed of the murder weapon); and *Edwards v. State*, 737 So.2d 275 (Miss. 1999) (burned victim's vehicle).

¶52. *Taylor* presents a unique fact situation. Any time a murder victim is found a month and a half after the murder, the facts surrounding the victim's death will probably be more difficult to determine, and any

28

statutory aggravator will probably be more difficult to prove. If Mildred Spires had been found the day after her death, then there may have been sufficient evidence to support this aggravator. Under the circumstances there was not. *Taylor* did not set any new standard or provide any new rule of law. *Taylor* is also distinguishable because there was evidence of another motive for the killing. In the present case, there appears to be no other motive, except the desire to eliminate witnesses.

¶53.    Doss also cites numerous cases from this Court on the avoiding arrest aggravator in an effort to show that the aggravator has been applied inconsistently, in almost every factual situation, to the point where it has been rendered arbitrary and unconstitutional. The State points out that this argument has been raised in numerous cases before this Court and has been rejected. *See Chase v. State*, 645 So.2d 829 (Miss. 1994); *Walker v. State*, 671 So.2d 581 (Miss. 1995); and *Wiley v. State*, 750 So.2d 1193 (Miss. 1999). This issue is without merit.

### VII.    Proportionality.

¶54.    Doss next takes issue with the fact that the jury found that he intended that a killing take place and that he had contemplated lethal force. Doss points out that the jury did not find that Doss killed or attempted to kill Robert C. Bell. Doss cites the trial judge's report which states that Frederick Bell shot Robert C. Bell. Doss argues that because he was "neither the trigger person nor the instigator" the death sentence in this case was disproportionate and should be vacated.

¶55.    This Court considered this issue on direct appeal as follows.:

> Doss primarily draws the Court's attention to two cases in support of his proportionality argument. He contends that given the failure of the jury to find that Doss killed or attempted to kill Bert Bell, that the sentence of death is excessive. The cases relied upon for his issue here are *Bullock v. State,* 391 So.2d 601 (Miss.1980) and *Reddix v.*

*State,* 381 So.2d 999 (Miss.1980) [FN48]. ***Bullock*** and ***Reddix*** are offered for the proposition that a death sentence is disproportionate against a non-trigger defendant involved in a capital murder case. [FN49]

FN48. Reddix was subsequently granted Habeas Corpus by ***Reddix v. Thigpen,*** 554 F.Supp. 1212 (S.D.Miss.1983) which was affirmed in part and reversed in part and remanded by ***Reddix v. Thigpen,*** 728 F.2d 705 (5th Cir.(Miss.) (1984). The 728 F.2d 705 decision was based upon the fact that the State had failed to prove that Reddix had the criminal intent to commit the murder or the requisite ***Enmund*** intent to be sentenced to death. Request for a rehearing of this decision and certiorari were denied respectively. ***Reddix v. Thigpen,*** 732 F.2d 494 (5th Cir.(Miss.)1984)) and ***Thigpen v. Reddix,*** 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). Such is not the case with Doss as two ***Enmund*** factors were found by the jury.

FN49. The Court very recently affirmed a death sentence against an instigator nontrigger defendant in ***Ballenger v. State,*** 667 So.2d 1242 (Miss.1995).

The State contends that Doss's reliance upon ***Bullock*** and ***Reddix*** is misplaced because the language relied upon did not garner a majority of votes. The original opinion from ***Bullock*** is offered against Doss for what *Bullock* really stands for.

> In the case at bar [***Bullock***], there is no record of the aggravating circumstances and mitigating circumstances in the trial of Tucker, and it is not possible to determine what circumstances influenced the jury in its life verdict. The law is well settled in this State that any person who is present, aiding and abetting another in the commission of a crime, is equally guilty with the principal offender. ***Jones [James] v. State,*** 307 So.2d 549 (Miss.1975); ***Bass v. State,*** 231 So.2d 495 (Miss.1970); ***McBroom v. State,*** 217 Miss. 338, 64 So.2d 144 (1953).

***Bullock,*** 391 So.2d at 614.

In light of the restatement in ***Bullock*** about accomplice liability, coupled with the fact that Doss's jury found two of the four required statutory findings for a death sentence under §§ 99-19-101(7) and ***Enmund,*** the State submits that Doss correctly received the death sentence as supported by case precedent and the jury's findings. We agree that the sentence is not disproportionate to Doss's involvement in the crime in this case. Accordingly, this issue is without merit. *See **Davis v. State,*** 660 So.2d 1228 (Miss.1995).

*Doss*, 709 So.2d at 400.

¶56.    Doss states that he has done a survey of this Court's death penalty decisions, and has found sixteen where the condemned "were not found to have pulled the trigger or otherwise physically caused the death." Doss states that the death penalty has been vacated or otherwise reversed in fourteen of these cases. Doss argues that this leaves two cases, *Carr v. State*, 655 So.2d 824 (Miss. 1995), and *Jordan v. State*, 728 So.2d 1088 (Miss. 1998), where the death sentence has not been reversed. Doss distinguishes these two decisions by saying that Carr and Jordan "were more involved" in the crimes for which they received the death sentence than was Doss.

¶57.    As for this Court's decision on this issue on Doss's direct appeal, Doss argues that this Court relied on *Ballenger v. State*, 667 So.2d 1242 (Miss. 1995), where this Court identified Ballenger as an "instigator non-trigger defendant."  Doss states that *Ballenger* should be distinguished, as Ballenger was the instigator and mastermind, while Doss was not. Doss claims that because of this erroneous analysis the issue is not barred by res judicata.

¶58.    The State answers that Doss's argument is nothing more than a proportionality claim, which was considered by this Court and rejected on direct appeal, and is barred by res judicata under Miss. Code Ann. § 99-39-21(3). The State argues that Doss's act of rephrasing this direct appeal issue will not render res judicata inapplicable. The State also argues that Doss's argument concerning the large number of cases where a death sentence has been reversed or vacated is misleading. The State does not identify the cases, but states that in twelve of the fourteen cases where the death penalty was reversed, it was done so on grounds other than the issue of the defendant's minimal involvement in the murder.

31

¶59. As for ***Ballenger***, this Court granted a new trial to Ballenger because of the trial court's failure to instruct the jury on the elements of the underlying felony of robbery, and not because her sentence was found to be disproportionate. *See **Ballenger v. State***, 761 So.2d 214 (Miss. 2000). While this Court may find degrees of differences between the involvement of Doss versus other death penalty defendants, they are not significant for purposes of this analysis. This matter was decided on direct appeal and nothing cited by Doss nullifies the procedural bar.

## VIII. Do the errors, when taken together, require reversal?

¶60. Doss finally argues that he is entitled to a new guilt and sentencing trial, or at least a new sentencing trial, due to the cumulative effect of the errors at his trial. Doss cites ***Williams v. State***, 445 So.2d 798, 810 (Miss. 1984), where this Court stated that it "has an established practice in capital cases of considering trial errors for their cumulative impact." As we find little error in the issues of this case, this issue is unconvincing.

## CONCLUSION

¶61. We grant Anthony Doss leave to proceed in the Grenada County Circuit Court only on his claim of ineffective assistance of counsel at the sentencing phase, and on his ***Atkins*** claim. We deny leave to proceed on all other claims.

¶62. **LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART.**

**SMITH, C.J., WALLER, P.J., CARLSON, GRAVES AND DICKINSON, JJ., CONCUR. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**

**EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶63.     As I disagree that Doss is entitled to proceed in the trial court on the issue of mental retardation, I must respectfully dissent in part.  The affidavit submitted from Dr. Merikangas concludes that neuropsychiatric evaluation is necessary.  However, the State notes the numerous contradictions and inconsistencies between the version of Doss's life provided by Doss and his family and that provided in the 1988 University of Mississippi report upon which Dr. Merikangas relied in his affidavit.  As noted by the majority and argued by the State, in 1988 Doss did not allege "a horrible, dangerous, traumatic experience" growing up in Chicago as he now alleges.  While, the majority applies the correct legal authority, it reaches the wrong conclusion.  The majority correctly states on the one hand that "the State raises numerous legitimate questions concerning Doss's claim."  However, the majority's conclusion to grant Doss leave to proceed in the trial court on this issue is flawed.  Therefore, I must respectfully dissent.